## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

---

MIRAF INTERNATIONAL, INC.,
436(c) N. Indian Creek Drive
Clarkston, GA  30021

NASIR WARSAMA,
422 N. Indian Creek Drive
Clarkston, GA  30021

ALI MIRAF,
751 N. Indian Creek Drive, Apt. #143
Clarkston, GA  30021

      Plaintiffs,

v.                                                          Civil Action _____

THE UNITED STATES of AMERICA;
GEORGE W. BUSH, in his official capacity as
President of the United States
1600 Pennsylvania Ave. NW
Washington, DC  20500

ALBERTO GONZALES,
in his official capacity as
Attorney General of the United States
950 Pennsylvania Avenue, NW
Washington, DC  20530-0001

HENRY M. PAULSON, JR.,
in his official capacity as
Secretary of the Treasury of the United States
1500 Pennsylvania Avenue, NW
Washington, DC  20220

CONDOLEEZZA RICE,
in her official capacity as
Secretary of State of the United States
2201 C Street, NW
Washington, DC  20520

ADAM J. SZUBIN,
in his official capacity as
Director, United States Department of the Treasury,
Office of Foreign Asset Control - Treasury Annex
1500 Pennsylvania Avenue, NW
Washington, DC 20220

ROBERT S. MUELLER, III,
in his official capacity as
Director, Federal Bureau of Investigations
J. Edgar Hoover Building
935 Pennsylvania Avenue, NW
Washington, DC 20535-0001,

       Defendants.

---

## COMPLAINT

---

Miraf International, Inc. ("Miraf"), Nasir Warsama, and Ali Miraf, for their Complaint

against the Defendants, hereby state and allege as follows:

### THE PARTIES

1.     Defendant George W. Bush ("Bush") is the President of the United States. He is

named as a defendant herein solely in his official capacity.

2.     Defendant Alberto Gonzales ("Gonzales") is the Attorney General of the United

States. He is named as a defendant herein solely in his official capacity.

3.     Defendant Henry M. Paulson, Jr. ("Paulson") is the Secretary of the Treasury of

the United States. He is named as a defendant herein solely in his official capacity.

4.     Defendant Condoleezza Rice ("Rice") is the Secretary of State of the United

States. She is named as a defendant herein solely in her official capacity.

5.     Defendant Adam J. Szubin ("Szubin") is the Director of the United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"). He is named as a defendant herein solely in his official capacity.

6.     Defendant Robert S. Mueller, III ("Mueller") is the Director of the Federal Bureau of Investigations of the United States ("FBI"). He is named as a defendant herein solely in his official capacity.

7.     Plaintiff Miraf is a Georgia corporation with its principal place of business in Clarkston, Georgia.

8.     Before November 7, 2001, Miraf operated a lawful money transfer business. Its business activities included sending funds from Somali nationals living in Georgia and its environs to support their families in Somalia and Somali refugee communities in other parts of the world. Miraf also served nationals of other east African countries, including Kenya, Ethiopia and Djibouti.

9.     Miraf's customers included naturalized United States citizens as well as non-citizen immigrants to the United States.

10.     Miraf is a small, Georgia-based business which lacked independent means to deliver its clients' funds into Somalia. In order to facilitate the transfers on behalf of its customers, it entered into a contract with the Al Barakaat network of companies ("Al Barakaat"), d/b/a Barako Trading Company ("Barako") in the United Arab Emirates ("UAE"), for delivery services. Miraf would typically wire the transfer instructions on behalf of its clients to Barako. Barako immediately delivered funds in the amounts instructed to the intended recipients. Miraf then reimbursed Barako for the amounts delivered.

11.     Miraf charged its clients a transfer fee of approximately 4-6%, depending on the recipient's location.  Miraf retained a percentage of the fee imposed and sent the remainder to Barako, in exchange for the services Barako provided under the terms of Miraf's contract with Barako.

12.     Miraf is not now, and has never been, an affiliate, division, subsidiary, or any other part of the Al Barakaat network of companies, and has never been owned in any part by the officers, employees, or owners of Al Barakaat or any of its affiliates, divisions or subsidiaries.

13.     Miraf is owned and operated by Plaintiff Nasir Warsama, its President, and Plaintiff Ali Miraf, its Secretary.

14.     Mr. Warsama is a resident of the State of Georgia.  He has his national origin in Somalia and has been a United States citizen since he was naturalized in 1992.

15.     Mr. Miraf is a resident of the State of Georgia, temporarily living in the United Arab Emirates.  He has his national origin in Somalia and has been a legal permanent resident of the United States since 1996.

16.     Both Mr. Warsama and Mr. Miraf are Muslim.


**JURISDICTION AND VENUE**

17.     This action arises under the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706 ("IEEPA"), and the Fifth and Sixth Amendments to the Constitution of the United States.

18.     This Court has jurisdiction under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702-04, and 28 U.S.C. §§ 1331 and 1346.

19.    One or more of the defendants resides in the District of Columbia and a substantial part of the events or omissions giving rise to Miraf's claims occurred in the District of Columbia.  Venue in the District of Columbia is therefore proper pursuant to 28 U.S.C. § 1391(e).

## FACTS

### A.    The Blocking of Miraf's Accounts

20.    On or about November 7, 2001, OFAC issued a Blocking Order against the Al Barakaat network of companies requiring that all assets owned by Al Barakaat and its related entities be blocked and frozen (the "Blocking Order").  In connection with the Blocking Order, OFAC designated Al Barakaat and its related entities as "Specially Designated Nationals" (SDNs) or "Specially Designated Global Terrorists" (SDGTs).  OFAC concurrently published the names and addresses of Al Barakaat and its related entities in the master list of "Specially Designated Nationals and Blocked Persons" on the OFAC website, which appears at http://www.treas.gov/offices/enforcement/ofac.

21.    OFAC has never issued a blocking order against Miraf nor designated Miraf or its owners, Mr. Warsama and Mr. Miraf, as SDNs or SDGTs.  It has never listed Miraf or its owners in its master list of Specially Designated Nationals and Blocked Persons.  Furthermore, OFAC has never at any time claimed or asserted that Miraf or its owners ever had any connection to, or involvement in, terrorist activities or the support of terrorist activities.

22.    On or about November 7, 2001, under the alleged authority of the Blocking Order against Al Barakaat, OFAC blocked and froze at least two bank accounts owned and controlled solely by Miraf and its owners and employees.  The assets frozen include approximately $17,580 held at a Wachovia Bank branch (formerly First Union National Bank) in Stone Mountain,

Georgia (account number 2080000575401); and approximately $48,470 held in a different account at another Wachovia Bank branch in Stone Mountain (account number 13361737).

23.     The blocked accounts contain funds entrusted to Miraf by its customers as bailee for transfer to intended recipients, as well as funds in which Miraf has a proprietary interest.

24.     Miraf has never intermingled funds with Al Barakaat or any of its affiliates. Al Barakaat has never had any property right or claim of interest in the funds held in the blocked accounts, and has never had any form of access to or control of the accounts.

25.     Miraf never received any formal notice of the Blocking Order or other notice from OFAC explaining that it had blocked Miraf's accounts. Rather, Miraf learned that OFAC had blocked its accounts indirectly, from the banks holding them.

26.     Immediately upon learning about the Blocking Order, Miraf took action to sever its relationship with Al Barakaat and its affiliates. On November 8, 2001, Miraf suspended its contract with Al Barakaat until such time as Al Barakaat and its affiliates are cleared of any wrongdoing. Miraf also offered to assist law enforcement by whatever means possible to support the effort against terrorism.

27.     At no time has Miraf or its owners ever knowingly associated with terrorists or supported terrorist activities. Miraf and its owners have never had any knowledge or reason to believe that Barako or the Al Barakaat network either supported terrorism or was affiliated with people involved in terrorism. Further, Miraf and its owners have no knowledge or information of any connection between any of its customers and persons who support or are engaged in terrorist activities.

28.     On December 4, 2001, Miraf received a letter from OFAC regarding the blocked accounts, attached hereto as Exhibit A. In the letter, dated November 28, 2001, OFAC alleged

that it was authorized to issue the Blocking Order pursuant to Executive Order Number 13224, issued by Defendant Bush on September 23, 2001, and under the authorities granted by the IEEPA. A copy of Executive Order 13224 is attached hereto as Exhibit B.

29.     In the November 28 letter, OFAC advised that it had designated Al Barakaat and its affiliates on its list of entities that support terrorism. The letter also stated that OFAC had "reason to believe" Miraf was "affiliated with, or a part of the Barakaat Network," and that the blocked accounts "may contain an interest of the Barakaat Network." OFAC further stated that it had blocked the accounts purportedly "pending an investigation and resolution of this matter."

30.     OFAC lacks evidence to support its allegation that Miraf was in any way affiliated with or a part of the Al Barakaat network or that the blocked accounts contain an interest of the Al Barakaat network.

31.     Upon information and belief, OFAC also lacks evidence to support its claim that Al Barakaat or any of its affiliates are involved in terrorism or support terrorism.

32.     More than five years have passed since OFAC blocked Miraf's accounts. Upon information and belief, OFAC is no longer investigating this matter and has no intent to resolve it. Rather, absent a court order mandating that OFAC release the blocked funds, it would continue to block them in perpetuity.

33.     The freezing of Miraf's accounts has caused great hardship to Plaintiffs. Miraf has not operated since the accounts were blocked. The blocking order has, therefore, destroyed a legitimate local business and the livelihoods of Mr. Warsama and Mr. Miraf. Moreover, many of Miraf's customers became angry about its inability to deliver the money they had entrusted to the company, thus causing irreparable damage to the goodwill and trust Mr. Warsama and Mr. Miraf had previously held in the community. Even if the accounts are unfrozen, Miraf will not be able

to recover and resume operations as a going concern. The government has done nothing to compensate Plaintiffs for these losses.

34.     The freezing of Miraf's accounts also has caused great hardship to its customers. Miraf's customers consist primarily of hardworking individuals lacking in substantial economic resources, who were trying to send money home to support their relatives. Many are the sole support for impoverished family members in Africa who have no other means to obtain food, clean water, clothing and shelter. It is unconscionable to continue withholding money belonging to these individuals. Unfreezing the accounts would permit Miraf to return the money held in its accounts to the customers who rightfully own it.

35.     The regulations governing Applications for the Release of blocked funds establish no time limit during which OFAC must issue a decision. *See* 31 C.F.R. §§ 501.806-807. Thus, OFAC's regulations purport to authorize it to block property indefinitely, notwithstanding a lack of any evidence to support the blockings or the severe, immediate and irreparable harm caused to affected persons.

**B.    Administrative Proceedings**

36.     Miraf, through its prior counsel, sent a letter to OFAC dated November 27, 2001, offering to provide OFAC with whatever information it needed in order to release the blocked accounts.

37.     OFAC responded by sending the letter dated November 28 (Exhibit A), which Miraf received December 4. In its letter, OFAC propounded detailed requests for information and documents from Miraf.

38.     Miraf responded by letter dated December 28, 2001. In its response, Miraf produced the documents requested by OFAC, including a copy of its contract with Al Barakaat,

and answered the requests for information.  Miraf also submitted a formal Application for the Release of Blocked Funds, requesting a limited license to use funds from the blocked accounts to pay its necessary business expenses, including rent, utilities, salaries, legal fees and other expenses.  That application was never decided.

39.    On December 1, 2004, the undersigned counsel, Fredrikson & Byron, P.A. ("Fredrikson"), sent a letter to OFAC requesting a limited license for Miraf to pay its attorneys' fees from one or more of the blocked accounts in connection with its legal efforts to unfreeze the accounts.  Having received no response to the request, Fredrikson telephoned OFAC on January 18, 2005 and was routed to an OFAC representative, who confirmed that OFAC had received the request.

40.    On February 8, 2005, Fredrikson received a letter from OFAC stating that on December 20, 2004, an OFAC representative had called and requested a copy of Fredrikson's retainer letter with Miraf.  That statement was false, as no such request had been received. Fredrikson immediately sent a copy of its retainer agreement to OFAC.

41.    On March 28, 2005, OFAC sent a letter denying the request to pay attorneys' fees from the blocked accounts.  OFAC instead issued a limited "license" to Miraf, which not only denied access to the blocked accounts, but purported to prohibit Miraf from obtaining fees for legal services from any source within the United States.  This limitation appears to have been based on the mistaken assumption that OFAC had included Miraf in its list of SDGTs and issued a blocking order against Miraf, when in fact it had only blocked Miraf's accounts incidental to the Blocking Order issued against Al Barakaat.

42.    Because OFAC has never issued a blocking order against Miraf nor designated Miraf as an SDN or SDGT, it lacked even the color of authority to prohibit Miraf from obtaining

legal fees from sources within the United States. Moreover, since Miraf is a United States company and does not maintain bank accounts overseas, the "license" was of no benefit to Miraf, and the asserted restrictions on Miraf's right to obtain legal fees from sources within the United States unconstitutionally purported to bar Miraf from paying for any legal representation.

43.    Fredrikson sent letters to OFAC on April 21, 2005 and July 21, 2005, pointing out its mistake and asking that Miraf's license request be reconsidered based on a corrected record. Having received no response to these requests, Fredrikson made a number of unsuccessful attempts to contact OFAC representatives by telephone during the months of September and October 2005.

44.    Having obtained no response from OFAC as to its previous license requests, Miraf filed another Application for the Release of Blocked Funds with OFAC on June 16, 2006. Unlike the previous applications, which had requested only limited licenses to pay Miraf's legal fees and expenses, the Application filed on June 16 requested that all funds in the blocked accounts be released. Copies of the Application and the Petition and Exhibits filed in support of the Application are attached hereto as Exhibit C.

45.    Miraf's Application and Petition were based on the grounds that: Miraf is not affiliated with Al Barakaat, and Al Barakaat has no interest in the accounts; OFAC has had sufficient time to investigate the matter, and the accounts should be unblocked since the investigation is no longer pending; and the Blocking Order against Al Barakaat is not supported by evidence and should be rescinded.

46.    On July 1, 2006, OFAC sent a letter to Miraf in response to the April 21, 2005 and July 21, 2005 letters from Fredrikson requesting reconsideration of Miraf's request for a license to pay attorneys' fees from the blocked accounts. In that letter, OFAC acknowledged

that Miraf has not been designated as an SDGT as it had mistakenly assumed. OFAC also rescinded the purported restrictions on Miraf's right to use or receive funds from sources within the United States and stated that such uses are permitted as long as the sources are not otherwise blocked. OFAC nevertheless denied the requests for reconsideration and continued to prohibit payment of Miraf's attorneys' fees from the blocked accounts.

47.    In its July 1, 2006 letter, OFAC also acknowledged receipt of Miraf's June 16, 2006 Application for the unrestricted release of all blocked funds in the accounts. The letter advised that the "June 16, 2006 request for Miraf's delisting" had been forwarded to the Designations Investigations Division of OFAC, which would respond separately.

48.    Nearly six months later, having received no response to its June 16, 2006 Application, Miraf sent a letter to OFAC on December 6, 2006, advising that it would initiate a lawsuit against OFAC on or after January 1, 2007 if no response from OFAC was received prior to that date. As of the date of filing this Complaint, OFAC has not responded to the Application or the December 6 letter.

**C.    Findings of the 9-11 Commission Staff**

49.    On or about November 27, 2002, Defendant Bush and the United States Congress appointed the 9-11 Commission to investigate the terrorist attacks of September 11, 2001. In executing its mandate, the 9-11 Commission appointed staff to draft and prepare a report to the Commission on terrorist financing, including allegations that had been made against Al Barakaat. The 9-11 Commission released the staff report to the public on or about August 21, 2004. The published report, entitled, National Commission on Terrorist Attacks Upon the United States, "Monograph on Terrorist Financing: Staff Report to the Commission" (hereafter, "Report"), is available at http://www.9-11commission.gov/staff_statements/911_TerrFin_Monograph.pdf.

50.     The Report states, among other findings, that as of the date of its release in August 2004 "neither the FBI nor OFAC is attempting to continue to investigate" Al Barakaat.

51.     The Report further states that the "evidentiary foundations" for the early designation of Al Barakaat as an SDN were "quite weak." The Report also said that United States intelligence agents assigned to investigate Al Barakaat following the 9-11 attacks "could find no direct evidence of any link between [A]l Barakaat and terrorism of any type."

52.     Based on the findings of the 9-11 Commission staff assigned to investigate Al Barakaat, OFAC lacks evidence to justify the Blocking Order against Al Barakaat, and that Order should be rescinded. All assets blocked pursuant to the Blocking Order, including the funds in Miraf's accounts, should be unblocked and released.

## COUNT I
## IEEPA, 50 U.S.C. § 1701
## (Against All Defendants)

53.     Plaintiffs restate and incorporate by reference the preceding paragraphs.

54.     In its November 28, 2001 letter to Miraf, OFAC claimed that it was authorized to block Miraf's accounts pursuant to the IEEPA.

55.     The IEEPA provides that the President may take action to deal with "any unusual or extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). This language does not permit the President to take action against any person who does not present an "unusual or extraordinary threat" to national security, foreign policy, or the economy.

56.     As discussed in the 9-11 Commission Staff Report, there is no evidence that either Al Barakaat or any of its affiliates presents any threat to the national security, foreign policy, or

the economy of the United States. Defendants' Blocking Order against Al Barakaat thus constitutes an *ultra vires* action unauthorized by the IEEPA, and the Blocking Order should be rescinded.

57.    There is no evidence that either Miraf or the funds in its blocked accounts present any threat to the national security, foreign policy, or the economy of United States. Defendants' blocking of Miraf's accounts thus constitutes an *ultra vires* action unauthorized by the IEEPA, and the accounts should be unblocked.

58.    For these reasons, Defendants' conduct is arbitrary, capricious, an abuse of discretion, and contrary to law. Plaintiffs have no adequate remedy at law and will suffer irreparable injury if Defendants are not enjoined from engaging in the activities described herein.

<div align="center">

**COUNT II**
**EXECUTIVE ORDER 13224**
**(Against All Defendants)**

</div>

59.    Plaintiffs restate and incorporate by reference the preceding paragraphs.

60.    In its November 28, 2001 letter to Miraf, OFAC claimed that it was authorized to block Miraf's accounts pursuant to Executive Order 13224 (Exhibit B).

61.    The Executive Order, Section 1, requires that all property or interests in property belonging to a list of specific persons (which does not include Plaintiffs) be blocked. The Executive Order provides for the designation of additional blocked persons whom the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, determines "to have committed or to pose a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States." The Executive Order also allows the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, to designate as blocked anyone found to "assist in,

sponsor, or provide financial . . . support for. . . such acts of terrorism" or "to be otherwise associated" with designated persons.

62.     Upon information and belief, OFAC's actions in blocking Miraf's accounts were undertaken with the knowledge and approval of the Secretary of the Treasury, Secretary of State and Attorney General (offices presently held by Defendants Paulson, Rice and Gonzales).

63.     Defendants have never designated Miraf or its owners as blocked persons under Executive Order 13224, or accused them of any involvement in terrorism.  Moreover, neither Al Barakaat nor any other blocked person has any interest in the property held in the accounts owned by Miraf.  Miraf's accounts, therefore, do not fall within the scope of Executive Order 13224.  Defendants' blocking of Miraf's accounts thus constitutes an *ultra vires* action unauthorized by the Executive Order, and the accounts should be unblocked.

64.     For these reasons, Defendants' conduct is arbitrary, capricious, an abuse of discretion, and contrary to law.  Plaintiffs have no adequate remedy at law and will suffer irreparable injury if Defendants are not enjoined from engaging in the activities described herein.

### COUNT III
### PROCEDURAL DUE PROCESS
### (Against All Defendants)

65.     Plaintiffs restate and incorporate by reference the preceding paragraphs.

66.     Defendants blocked Miraf's accounts without notice, and without providing Miraf with an administrative or judicial hearing or other review of any kind.

67.     OFAC has had more than five years to investigate its claims against Al Barakaat and the properties blocked pursuant to the Blocking Order, including Miraf's accounts.  As discussed in the 9-11 Commission Staff Report, OFAC's investigation of Al Barakaat has been effectively closed since at least August 2004.

14

68.    Notwithstanding the passage of time and the closing of the investigation, Defendants have continued to deny Miraf administrative review, by failing to consider and decide Miraf's request for the release of the blocked accounts within a reasonable period of time.

69.    Defendants' actions, as described herein, have deprived Plaintiffs of their property interests (including the right to access, use, transfer or return the property to Miraf's customers) without due process of law.  Such conduct violates the Fifth Amendment to the United States Constitution.

## COUNT IV
### SUBSTANTIVE DUE PROCESS
**(Against All Defendants)**

70.    Plaintiffs restate and incorporate by reference the preceding paragraphs.

71.    Defendants, through the actions described herein, have imposed severe punishment on Plaintiffs and deprived them of their fundamental rights without conviction of any crime by the United States or any State thereof.

72.    Defendants' conduct is arbitrary and overbroad, and is not reasonably tailored to meet legitimate government needs.

73.    Defendants' conduct thus violates Plaintiffs' right to substantive due process under the Fifth Amendment to the United States Constitution.

## COUNT V
### TAKING WITHOUT JUST COMPENSATION
**(Against All Defendants)**

74.    Plaintiffs restate and incorporate by reference the preceding paragraphs.

75.    Defendants have never compensated Miraf, Mr. Warsama, or Mr. Miraf, for the total loss of use of the funds frozen in the blocked accounts.

76.     Defendants' conduct has effected a taking of private property for public use without just compensation, in violation of the Takings Clause of the Fifth Amendment to the United States Constitution.

## COUNT VI
## EQUAL PROTECTION
### (Against All Defendants)

77.     Plaintiffs restate and incorporate by reference the preceding paragraphs.

78.     Prior to the cessation of its business in November 2001, Miraf operated its business in a fashion similar to other wiring services, such as Western Union Financial Services, Inc. ("Western Union").

79.     Published news reports indicate that in the three days prior to the terrorist attacks against the United States on September 11, 2001, the hijackers involved in those attacks sent four payments to the United Arab Emirates using the services of Western Union.

80.     Unlike Western Union, there is no direct or indirect connection between Miraf and terrorism or persons engaged in terrorist activities.

81.     Upon information and belief, Defendants have never blocked Western Union's accounts or subjected it to a Blocking Order of any kind.

82.     Defendants' disparate treatment of Miraf, as compared to Western Union, is motivated in whole or in part by the national origin and religious beliefs of its owners, Mr. Warsama and Mr. Miraf.

83.     Defendants' conduct is not narrowly tailored to meet compelling government interests, and thus violates the Equal Protection Clause of the Fourteenth Amendment as incorporated into the Fifth Amendment to the United States Constitution.

16

## COUNT VII
## SIXTH AMENDMENT TRIAL RIGHTS
### (Against All Defendants)

84.    Plaintiffs restate and incorporate by reference the preceding paragraphs.

85.    Defendants' conduct, as described herein, imposed severe punishment against Plaintiffs without affording them their rights under the Sixth Amendment to the United States Constitution to notice of the charges against them, to confront any witnesses against them, to compulsory process for obtaining witnesses in their favor, to a trial by jury, and to the assistance of counsel.

**WHEREFORE,** Plaintiffs, on behalf of themselves and as bailees for their customers, respectfully request the following relief:

1.    A declaration that Defendants' actions violate the Fifth and Sixth Amendments to the United States Constitution, the Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, and Executive Order Number 13224;

2.    A preliminary and permanent injunction directing Defendants to de-list Al Barakaat and remove all restrictions on persons and property subject to the Blocking Order against Al Barakaat, including the assets held in Miraf's blocked accounts;

3.    A preliminary and permanent injunction directing Defendants to remove all restrictions on blocked property in which Plaintiffs have any proprietary interest, including the blocked accounts identified herein, and any other property blocked under the Blocking Order against Al Barakaat or any other blocking order;

4.    An order awarding Plaintiffs their costs and attorneys' fees; and

5.    Such other and further relief as the Court deems just and equitable.

### [signatures on the next page]

Dated: _2/13/07_____, 2007

Respectfully Submitted,

_____
John W. Lundquist (#65286)
jlundquist@fredlaw.com
Dulce J. Foster (#285419)
dfoster@fredlaw.com
FREDRIKSON & BYRON, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, Minnesota  55402-1425
Telephone:  (612) 492-7000
Facsimile:  (612) 492-7077

ATTORNEYS FOR PLAINTIFFS

*Representing Plaintiffs without
compensation pursuant to L. Cv. R. 83.2(g)*

4143040

## CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

### I (a) PLAINTIFFS

Miraf International, Inc., Nasir Warsama, and Ali Miraf

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ___88888___
(EXCEPT IN U.S. PLAINTIFF CASES)

### DEFENDANTS

The United States of America, George W. Bush, Alberto Gonzales, Henry M. Paulson, Jr., Condoleezza Rice, Adam J. Szubin, and Robert S. Mueller, III, in their official capacities

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ___11001___
(IN U S PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

John Lundquist and Dulce Foster
Fredrikson & Byron, P.A.
200 South 6th Street, Suite 4000
Minneapolis, MN  55402

ATTORNEYS (IF KNOWN)

---

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 3 Federal Question (U S Government Not a Party)

◉ 2 U.S. Government Defendant

○ 4 Diversity (Indicate Citizenship of Parties in item III)

### III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

### IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

○ **E. General Civil (Other)**     OR     ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ⊙ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☒ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Injunction against the U.S. for violating the Constitution and IEEPA, 50 U.S.C. Sections 1701-06, by blocking Plaintiffs' assets.

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ Injunction & Fees   Check YES only if demanded in complaint   JURY DEMAND:   YES ☐   NO ☒

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE 2/13/07   SIGNATURE OF ATTORNEY OF RECORD

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.



### DEPARTMENT OF THE TREASURY
#### WASHINGTON, D.C. 20220

## REQUIREMENT TO FURNISH INFORMATION

FAC No. SDT-197007

Miraf International Inc.                        NOV 2 8 2001
c/o Jeanette Freeman
55 Marietta Street N.W.
Suite 1555
Atlanta, Georgia 30303

Gentlemen:

     The United States Treasury Department's Office of Foreign
Assets Control ("OFAC") administers a comprehensive sanctions
program and assets freeze pursuant to Executive Order No. 13224
(66FR49079), issued by President Bush on September 23, 2001 (the
"Order"), and under the authorities granted by the International
Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06 ("IEEPA").

     On November 7, 2001, pursuant to the Order, the Treasury
Department designated Al-Barakaat and its affiliated group of
companies (the "Barakaat Network") as entities that provide
financial support or other services to persons who commit,
threaten to commit, or support terrorism (Specially Designated
Global Terrorist ("SDGT")).  As such, all property and interest
in property of the Barakaat Network that are in the United
States, that hereafter come within the United States, or that
are or hereafter come within the possession or control of United
States persons, are blocked. Blocked property may not be
transferred, withdrawn, exported, paid, or otherwise dealt in
without prior authorization from OFAC.

     OFAC has reason to believe that Miraf International Inc.
("MII") may be connected to, affiliated with, or a part of the
Barakaat Network. Furthermore, OFAC has reason to believe that
MII bank account number 2080000575401 at First Union National
Bank, and bank account numbers 13361737, 28911216 and 25307528
at Wachovia Bank, may contain an interest of the Barakaat
Network.  Therefore, on November 7, 2001, OFAC blocked these
accounts pending an investigation and resolution of this matter.

     Pursuant to the Order, § 1702(a)(2) of IEEPA, and § 501.602
of the Reporting and Procedures Regulations, 31 C.F.R. Part 501,
MII is hereby required to provide OFAC with a written report
concerning this matter.  At a minimum, the report must include

**Exhibit A**

2

information and records responsive to the following areas:

1. List and describe all the types of business activities in
   which MII engages. For each type of business activity,
   provide MII's gross earnings for year 2000. Provide any
   supporting tax records, accounting records, or other financial
   records.

2. Describe the organizational structure of MII. If applicable,
   describe the various divisions, or units of MII, their
   functions, and methods of operation.

3. Identify all names under which MII operates or has operated in
   the past.

4. Provide the names and addresses of all owners, officers,
   directors, managers, and employees of MII.

5. Provide a narrative describing the legal structure between MII
   and the Barakaat Network of companies. Include the
   address(es), phone number(s), and contact person(s) for all
   Barakaat Network companies with which you share a legal
   relationship.

6. Provide a narrative describing the financial and operational
   structure between MII and the Barakaat Network of companies.
   Include the address(es), phone number(s), and contact
   person(s) for all Barakaat Network companies with which you
   share a financial and operational relationship.

7. List the names and addresses of all employees and owners of
   MII who have ever worked for the Barakaat Network in any
   capacity.

8. To the extent you have not done so, if any entities (or
   persons) other than MII maintain a physical presence within
   your facility, identify such entities. Describe the nature of
   the relationship between MII and such entities and describe
   what type of activities such entities are engaged in on the
   premises. Provide the name(s), address(es), and phone
   number(s) of such entities, their owners and their
   representatives.

9. Provide a list of all past and present bank accounts
   maintained by MII and/or its owners (list the bank numbers,
   the name and address of the financial institution, and
   the status of each account). Provide a copy of the monthly

3

statement for each account during the past twenty-four
months.

10. Provide copies of all contracts, leases, or other written
agreements, and documents relating thereto, between MII
(and/or its owners) and any other entity. Provide a written
description of any oral agreements of similar nature between
MII and any other entity.

11. To the extent not otherwise provided, provide all
accounting, tax, and financial records pertaining to the
operation of MII that have been generated in the past
twenty-four months and all documents supporting these
records.

12. Provide copies of all payroll records regarding the
operation of MII that were generated in the past twenty-four
months.

13. Provide copies of all papers, tickets, notes, schedules,
receipts, passports, and other documents reflecting domestic
or international travel by MII's employees, owners, agents,
representatives, attorneys, officers or directors within the
past twenty-four months.

14. For the past twenty-four months, provide copies of all
written correspondence, notes, memoranda, books, records,
receipts, ledgers, charts, and other documents related to or
referencing the wire transfer operations of MII or of any
other entity conducting wire transfer operations on MII's
business premises.

15. For the past twenty-four months, provide copies of all
documents relating to the transfer, receipt, deposit,
storage or transmittal of monetary funds by MII or by any
other entity operating from MII's business premises.  This
requirement includes, but is not limited to, books, records
in any form, receipts, bank statements, bank deposit and
withdrawal receipts, money drafts, letters of credit, money
orders, traveler's checks, cashier's checks, passbooks, bank
checks, and other documents.

16. To the extent that MII controls or is in possession of
information in the form of electronic data, compact disc
data, video or audio tapes, photographs, microfiche,
microfilm, rolodex indices, address and telephone books,
facsimile transmissions and reports, ledgers, records,

4

packages, receipts, invoices, notes, correspondence, memoranda, charts, drawings, books, bank receipts, passbooks, checks or other monetary instruments, relating to any of the items described in requests 1 - 15, provide a copy of each.

If you have already provided all or part of the documents listed in this requirement as part of an additional federal legal process, please notify this office immediately.

Your report is due at OFAC within 20 business days from date of receipt of this letter and should be addressed as follows:

U.S. Department of the Treasury
Office of Foreign Assets Control
Attn:  Richard J. Hollas II
1500 Pennsylvania Avenue, N.W. (Annex)
Washington, D.C. 20220.

Depending on the extent of information contained in your response, a supplemental requirement for information may be issued by this Office.

OFAC has licensing authority to help ameliorate the effect of the blocking. OFAC will consider requests for specific licenses to allow for payment from blocked accounts of outstanding financial obligations owed by MII, such as salary, rent and utility payments, as well as payment of attorneys' fees and expenses related to legal representation of MII in this matter.

Criminal penalties for violation of the Order and IEEPA range up to 10 years in prison, $500,000 fine, for corporations and $250,000 fine for individuals.  Civil penalties may be imposed by OFAC up to $11,000 per violation.

Please be advised that failure to respond may result in the imposition of civil penalties.  If you have any questions, please call Mr. Hollas at (202) 622-2430. x7

Richard↑

Sincerely,

David H. Harmon
Chief, Enforcement Division
Office of Foreign Assets Control



**[Executive Orders]**

---

## Executive Order 13224 of September 23, 2001

**Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.)(IEEPA), the National Emergencies Act (50 U.S.C. 1601 et seq.), section 5 of the United Nations Participation Act of 1945, as amended (22 U.S.C. 287c) (UNPA), and section 301 of title 3, United States Code, and in view of United Nations Security Council Resolution (UNSCR) 1214 of December 8, 1998, UNSCR 1267 of October 15, 1999, UNSCR 1333 of December 19, 2000, and the multilateral sanctions contained therein, and UNSCR 1363 of July 30, 2001, establishing a mechanism to monitor the implementation of UNSCR 1333,

I, GEORGE W. BUSH, President of the United States of America, find that grave acts of terrorism and threats of terrorism committed by foreign terrorists, including the terrorist attacks in New York, Pennsylvania, and the Pentagon committed on September 11, 2001, acts recognized and condemned in UNSCR 1368 of September 12, 2001, and UNSCR 1269 of October 19, 1999, and the continuing and immediate threat of further attacks on United States nationals or the United States constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and in furtherance of my proclamation of September 14, 2001, Declaration of National Emergency by Reason of Certain Terrorist Attacks, hereby declare a national emergency to deal with that threat. I also find that because of the pervasiveness and expansiveness of the financial foundation of foreign terrorists, financial sanctions may be appropriate for those foreign persons that support or otherwise associate with these foreign terrorists. I also find that a need exists for further consultation and cooperation with, and sharing of information by, United States and foreign financial institutions as an additional tool to enable the United States to combat the financing of terrorism.

I hereby order:

Section 1. Except to the extent required by section 203(b) of IEEPA (50 U.S.C. 1702(b)), or provided in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order, all property and interests in property of the following persons that are in the United States or that hereafter come within the United States, or that hereafter come within the possession or control of United States persons are blocked:

(a) foreign persons listed in the Annex to this order;

(b) foreign persons determined by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, to have committed, or to pose a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States;

(c) persons determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, to be owned or controlled by, or to act for or on behalf of those persons listed in the Annex to this order or those persons determined to be subject to subsection 1(b), 1(c), or 1(d)(i) of this order;

**Exhibit B**

(d) except as provided in section 5 of this order and after such consultation, if any, with foreign authorities as the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, deems appropriate in the exercise of his discretion, persons determined by the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General;

(i) to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, such acts of terrorism or those persons listed in the Annex to this order or determined to be subject to this order; or

(ii) to be otherwise associated with those persons listed in the Annex to this order or those persons determined to be subject to subsection 1(b), 1(c), or 1(d)(i) of this order.

Sec. 2. Except to the extent required by section 203(b) of IEEPA (50 U.S.C. 1702(b)), or provided in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date:

(a) any transaction or dealing by United States persons or within the United States in property or interests in property blocked pursuant to this order is prohibited, including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of those persons listed in the Annex to this order or determined to be subject to this order;

(b) any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this order is prohibited; and

(c) any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

Sec. 3. For purposes of this order:

(a) the term "person" means an individual or entity;

(b) the term "entity" means a partnership, association, corporation, or other organization, group, or subgroup;

(c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States; and

(d) the term "terrorism" means an activity that --

(i) involves a violent act or an act dangerous to human life, property, or infrastructure; and

(ii) appears to be intended --

(A) to intimidate or coerce a civilian population;

(B) to influence the policy of a government by intimidation or coercion; or

(C) to affect the conduct of a government by mass destruction, assassination, kidnapping, or hostage-taking.

Sec. 4. I hereby determine that the making of donations of the type specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by United States persons to persons determined to be subject to this order would

seriously impair my ability to deal with the national emergency declared in this order, and would endanger Armed Forces of the United States that are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances, and hereby prohibit such donations as provided by section 1 of this order. Furthermore, I hereby determine that the Trade Sanctions Reform and Export Enhancement Act of 2000 (title IX, Public Law 106-387) shall not affect the imposition or the continuation of the imposition of any unilateral agricultural sanction or unilateral medical sanction on any person determined to be subject to this order because imminent involvement of the Armed Forces of the United States in hostilities is clearly indicated by the circumstances.

Sec. 5. With respect to those persons designated pursuant to subsection 1(d) of this order, the Secretary of the Treasury, in the exercise of his discretion and in consultation with the Secretary of State and the Attorney General, may take such other actions than the complete blocking of property or interests in property as the President is authorized to take under IEEPA and UNPA if the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, deems such other actions to be consistent with the national interests of the United States, considering such factors as he deems appropriate.

Sec. 6. The Secretary of State, the Secretary of the Treasury, and other appropriate agencies shall make all relevant efforts to cooperate and coordinate with other countries, including through technical assistance, as well as bilateral and multilateral agreements and arrangements, to achieve the objectives of this order, including the prevention and suppression of acts of terrorism, the denial of financing and financial services to terrorists and terrorist organizations, and the sharing of intelligence about funding activities in support of terrorism.

Sec. 7. The Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA and UNPA as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government. All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order.

Sec. 8. Nothing in this order is intended to affect the continued effectiveness of any rules, regulations, orders, licenses, or other forms of administrative action issued, taken, or continued in effect heretofore or hereafter under 31 C.F.R. chapter V, except as expressly terminated, modified, or suspended by or pursuant to this order.

Sec. 9. Nothing contained in this order is intended to create, nor does it create, any right, benefit, or privilege, substantive or procedural, enforceable at law by a party against the United States, its agencies, officers, employees or any other person.

Sec. 10. For those persons listed in the Annex to this order or determined to be subject to this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds or assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render these measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in this order, there need be no prior notice of a listing or determination made pursuant to this order.

Sec. 11. (a) This order is effective at 12:01 a.m. eastern daylight time on September 24, 2001.

(b) This order shall be transmitted to the Congress and published in the Federal Register.

GEORGE W. BUSH

THE WHITE HOUSE,

September 23, 2001.

## ANNEX

Al Qaida/Islamic Army

Abu Sayyaf Group

Armed Islamic Group (GIA)

Harakat ul-Mujahidin (HUM)

Al-Jihad (Egyptian Islamic Jihad)

Islamic Movement of Uzbekistan (IMU)

Asbat al-Ansar

Salafist Group for Call and Combat (GSPC)

Libyan Islamic Fighting Group

Al-Itihaad al-Islamiya (AIAI)

Islamic Army of Aden

Usama bin Laden

Muhammad Atif (aka, Subhi Abu Sitta, Abu Hafs Al Masri)

Sayf al-Adl

Shaykh Sai'id (aka, Mustafa Muhammad Ahmad)

Abu Hafs the Mauritanian (aka, Mahfouz Ould al-Walid, Khalid Al- Shanqiti)

Ibn Al-Shaykh al-Libi

Abu Zubaydah (aka, Zayn al-Abidin Muhammad Husayn, Tariq)

Abd al-Hadi al-Iraqi (aka, Abu Abdallah)

Ayman al-Zawahiri

Thirwat Salah Shihata

Tariq Anwar al-Sayyid Ahmad (aka, Fathi, Amr al-Fatih)

Muhammad Salah (aka, Nasr Fahmi Nasr Hasanayn)

Makhtab Al-Khidamat/Al Kifah

Wafa Humanitarian Organization

Al Rashid Trust

Mamoun Darkazanli Import-Export Company

# # #



June 16, 2006

**<u>VIA CERTIFIED MAIL</u>**

Barbara Hammerle, Acting Director
U.S. Department of Treasury
Office of Foreign Assets Control
1500 Pennsylvania Avenue NW (Annex)
Washington, DC 20220

**Re: Application and Petition to Unblock Assets
         Miraf International, Inc.**

Dear Mr. Werner:

Enclosed and served upon you, please find the following documents on behalf of Miraf
International, Inc.:

1. Application for the Release of Blocked Funds;
2. Petition in Support of the Application of Miraf, International, Inc. for the Release of
   Blocked Funds; and
3. Exhibits A-N in support of the Application and Petition.

We would appreciate your prompt response in connection with this important matter. Please do
not hesitate to call me with any questions or concerns.

Very truly yours,

Dulce J. Foster
*Attorney at Law*
Direct Dial: 612.492.7110
**Email:** dfoster@fiedlaw.com

DJF:j111:4044850
End.
CC:    Mr. Nasir H. Warsama (enc.)                                   **<u>Exhibit C</u>**
       John W. Lundquist, Esq. (enc.

Attorneys & Advisors       Fredrikson & Byron, RA.
     main 612 492.7000      200 South Sixth Street, Suite 4000
       fax 612 492 7077      Minneapolis, Minnesota
     www fredlaw com       55402-1425

MEMBER OF THE WORLD SERVICES GROUP      OFFICES
*A Worldwide Network of Professional Service Providers*      Minneapolis, London, & Monterre ʸ Mexico

U.S DEPARTMENT OF THE TREASURY

OFFICE OF FOREIGN ASSETS CONTROL

APPLICATION FOR THE RELEASE OF BLOCKED FUNDS

(WHEN APPROVED. THIS DOCUMENT BECOMES A
SPECIFIC LICENSE AUTHORIZING THE UNBLOCKING
OF THE:SUBJECT FUNDS *AND* THEIR RELEASE
ACCORDING TO THE TERMS HEREOF)

Pork®    rEIN THIS BOX— WIENS'S APPROVAL ONLY VAL® Yint OFAC seal.

MS APPLIOATIONISHERESY:                    FACAPENSEND _____

APPROVED. = FDS MAYBE UNBLOCKED AND RFLEASED            VALUE:
G           OMIVATOR OR 06SZIATING SANK
G           IN ACCORDANCE WITH ORIGINAL PAYMENT I NSTRUCTPNS

DENıED (SEEAITAClıED evtANA•nom

G          RETURNED VATHOUı ACTION (SEE ATMORE) CHECKLIST)

TYPE OF REQUEST (CHECK APPROPRIATE BOX)
E3        LICENSE APPLICATION
          REQUEST FOR RECONSIDERATION (PROVIDE
          FAO NO OF PREVIOUS AGENCY ACTION OF KNOWNN:

## APPLICANT INFORMATION

| ◇ANT  Mire International, Inc | **ADDRESS** LIRE 1  clo FredrikSon & Syron, P.A. | ADDRESS LINES  200 South 6th Street Ste 4000 | |
|---|---|---|---|
| CITY  Minneapolis | STATE  Minnesota | coiggxpirtOm  John W Lundquist  Dulce J Foster | TELEPHONE  612-492-7000 | FAX NU43ER  612-492-7077 |
| POSTAL coog  ,9402-142q | COUNTRY  United States | 40CIALSEOURITYfrAXPAYER  *D.* NO.  (Rınturosel far US PerJoos!  58.238  66 | EMAIL ADORESR  jlundquistafredlaw,corn |

## CORPORATIONS AND OTHER ENTITIES

| PRINCIPAL MACE OF BUSINESS  422 North Indian Creek Drive  Clarkston | STATE OF INCORPORATION OR ORGANTZATICN  Georgia | EMPLOIERIDENTIRCATION NUMBER  58-2382536 |
|---|---|---|

THE FOLLOWING INFORMATION, IF KNOWN, SHOULD BE PROVIDED CONCERNING THE BLOCKED FUNDSSUSE PAGE 2 AS NEEDED)

| NAME& ADDRESS OF SNANCrAL INSSINSION MUCH SLOOıED FUNDS  See Page 2 | AMOUNT BLOCKED | DATE OF THE swam |
|---|---|---|
| | $66,050 (approx.) 11/07/01 | |
| mama NAME & ADDRESS  Various individual customers-see attached list,  **(Exhibit. N)** | RAMMING FINANClAL:ilmSTMMON *NAMES* ADDRESS | |
| INtERSIED1ARY FINANCIAL INSTITUTION(S) NAME & ADDRESS | BENEFICIARY FINANCIAL INSTITUTION NAME& ADDRESS  No financial institution; transfers delivered through Sarakat  money wire transfer network | |
| ISSYEFICIARY NAME &ADDRESS  Mira? International, Inc and various individuals-  see attached list    **(Exhibit N)** | DESCRIPTION OF UNDERLYING TRANSACTION (A:17ACR SEPARATE SHEET AS  NEEDED)  money wire transfers | |

APPLICATION CERTIFICATION: I, THE UNDERSIGNED, HERESY DECLARE THAT, TO THE IB EST OF MY KNOWLEDGE, THE INFORMATION
PROVIDED ON THIS APPLICATION AND ANY AC0014 PANTING DOCUMENTATION IS TRUTHFUL AND COMPLETE.

| SIGNATURE | *NAME* OF SIGNER • -  Nasir Warsarna | TITLE OF SIGNER  President | June 6, 2006 |
|---|---|---|---|

ADDITIONAL COPIES OF THIS FORM MAY BE OBTAINED FROM °FAG'S WEBSITE AT NO CHARGE: <http://www.treas.goviofac>

PAGE 2

ADDITIONAL INFORMATON

The following blocked accounts am inducted in this applicatiort:

Wachovia Bank
(filth First Union National Bank)
3860 Rockbridge Road.
Stone Mountain, GA 3,oO3.
Account No. 2080600575401
*kit* Blocked: Approx. **$17,680**

Wachevia Bank
4820 Memorial Drive
Stone Mountain, GA 30083
Account No. 13381737
Amt 816cked: Approx. $48,470

Any other accounts **owned by,Miraf ken/atonal, Inc. {Wirer) that have** b4én blocked pursuant to the blocking order at
issue, Which are not yet identified

mire* Submitted several prior requests to OFAC to unblock portions of tIle funds at issue:

I On December 28, 2001, Miraf submitted an **application**-for elimitedllcense,ta use blocked funds for the purpose of
paying its outstanding debts and              Correspondence related to that application was assigned to the
following file numbers: SbT-206295              SDO-208751; SOT-107007; This application does not appear
to have been adjudicated.                    201296,

**On** December 1, 2004, Fredrikson & Byron, P A. submitted a letter request for for a limited license to use funds from
the blocked accounts for, the purpose of paying ettoineys fees in onneċtion with legal efforts to unblock the accounts
entirely OFAC denied that request on March 22,2005. Instead, 'a ie'terely limited license, permitting only the reCeipt
of payment for legal fees from sources outside the United State*, was Ostied'on that date, (license *No.* SOOT-450..)
ThatIibenSe  Xpirrcl on Fabiliasi28,2006. **SO*1** letter requests seeking reconsideration of the denial have been
submitted, but OFAOhaSTIOt reSPCndia to thesekilueSTS. COnapórkiéncii*it    tdthIS114PriSeTetgidSffiaS
assigned to the following fire numbers: SDG-422; SDGT-459; SIOG-491i

The present application does not constitute a request for reconsideration ọf any of the previous requests for limited **l**censes
to use the blocked funds.  Rather, Wiliaif International seeks to have all of the funds at issue released and unblocked, in their
_e_Mirety,ori the <u>grounds Set forth in</u> <u>the a  kacect</u> Petition.

UNITED STATES DEPARTMENT OF THE TREASURY
OFFICE OF FOREIGN ASSETS CONTROL

**PETITION IN SUPPORT OF THE APPLICATION
OF MIRAF INTERNATIONAL, INC.,
FOR THE RELEASE OF BLOCKED FUNDS**

Applicant, Miraf International, Inc. ("Miraf'), respectfully petitions the United States

Department of the Treasury, Office of Foreign Assets Control ("OFAC") as follows:

### INTRODUCTION

Pursuant to 31 C.F.R. Part 501, Subpart E, and 31 C.F.R. § 594.501, Miraf submits this

Memorandum in support of its Application and request for the unblocking of all funds held in

bank accounts owned by Miraf pursuant to a Blocking Order issued November 7, 2001. OFAC

has stated that it blocked Miraf's accounts based upon its past business relationship with the Al

Barakaat money wire transfer network, which has been listed on OFAC's list of Specially

Designated Nationals ("SDN") as an entity that allegedly provides financial support or other

services to persons who commit or support terrorism. Miraf has severed its relationship with Al

Barakaat—It is not--affiliated-with or a part of the Al- Barak-aat networki-and-Al-Barakaat-h-as-no

interest in the blocked accounts. The Blocking Order does not apply to Miraf's accounts for

these reasons.

Moreover, in the more than four years that it has had to investigate this matter, the

government has never asserted that Miraf has in any way associated with terrorists or supported

terrorist activities, and has never listed Miraf as an SDN. Furthermore, according to reports

issued by 9-11 Commission staff, the United States lacks proof of any link between the Al

Barakaat network and terrorism. The Blocking Order that resulted in the freezing of Miraf's

accounts thus has no legal merit and should be rescinded. Nevertheless, OFAC has continued to

deny Miraf access to its accounts without procedural process and without justification. Release of these accounts is long overdue.

## FACTS

**A.**    **Mirafs Business Operations**

Miraf is a corporation located in Clarkston, Georgia, which is owned and controlled by its President, Nasir Warsma, and its Secretary, Ali Miraf. Before OFAC issued the Blocking Order on November 7, 2001, Miraf operated a lawful wire transfer service with the primary business purpose of sending funds from Somali nationals living in Georgia to support their families in Sotholia and Somali refugee communities in other parts of the world. Miraf also sewed nationals of other east African countries, including Kenya, Ethiopia and Djibouti.

Without Miraf's services, many of its customers would have had no way to provide aid to impoverished relatives suffering in these regions. Somalia lacks any functioning system of banks, such that wiring funds into the country to support relatives presents special challenges for Somali nationals living in the United States. Because Miraf operated as a small, local company, it did not have any independent means of delivering funds into Somalia. Rather, in order to facilitate the wire transfers on behalf of its clients, Miraf contracted with the Al Barakaat network of companies ("Al Barakaat"), d/b/a the Barako Trading Company ("Barako") in the United Arab Emirates ("UAE"). Miraf typically wired the transfer instructions to Barako, and then Barako immediately delivered funds in the amounts instructed to the intended recipients. Miraf would then reimburse Barako for the amounts delivered. A copy of Miraf's contract with Al Barakaat is attached as Exhibit A (including a copy of the executed, contract in Somali, an unsigned version of the same, and an English translation).

Although Miraf had a contract with Al Barakaat to deliver money on behalf of its customers, it has never been a subsidiary of, an affiliate of, or in any other way a part of the Al Barakaat network of companies. Miraf is a small, local corporation based in Georgia that is independently owned and controlled by individuals who are not—and have never been—officers, employees, or owners of Al Barakaat or any of its divisions or subsidiaries. Its relationship with Al Barakaat was contractual only.

Miraf operated by collecting funds for transfer from individual customers and then wiring those funds to Barako for delivery. The amounts collected ranged from approximately $30 to $1,000 per transfer. Miraf typically imposed a charge on each transfer of approximately 4-6% of the amount wired, depending on the recipient's location. Miraf retained a percentage of the fee imposed, and sent the remainder to Barako. Barako did not take ownership of, or acquire an interest in, its portion of the fee imposed until the funds reached its account in the UAE.

At no point in time has Miraf ever intentionally associated with terrorists or supported terrorist activities. Miraf never had any reason to believe that Barako or the Al Barakaat network was involved in terrorism or affiliated with people involved in terrorism. Miraf entered into the contract with Al Barakaat only because it offered the best means of delivering funds on behalf of Miraf s clients. When Miraf learned about the Blocking Order and the government's allegations of purported ties between Al Barakaat and terrorism, Miraf immediately took action to sever its relationship with Al Barakaat. On November 8, 2001—just one day after the Blocking Order was issued—Miraf suspended its contract with Al Barakaat until such time as Al Barakat and its affiliates are cleared of any wrongdoing. Miraf, furthermore, offered to assist law enforcement by whatever means possible to support the effort against terrorism. A copy of Miraf s corporate

3

statement regarding the contract suspension and law enforcement cooperation is attached hereto as Exhibit B.

As a result of the Blocking Order, two bank accounts owned and controlled by Miraf were frozen. The assets frozen include approximately $17,580 held at Wachovia Bank (formerly First Union National Bank), 3860 Rockbridge Road, Stone Mountain, GA 30083, in account number 2080000575401; and $48,470 held in Wachovia Bank (4820 Memorial Drive, Stone Mountain, GA 30083), in account number 13361737. Through this Petition and the attached Application, Miraf seeks the release of these funds and any other assets in which it has an ownership interest that may have been blocked pursuant to the Blocking Order.

In the over four years that have passed since Miraf's bank accounts were frozen, the government has had ample time to investigate Miraf's contract with Al Barakaat and reach a conclusion as to whether Miraf has any ties to terrorism. In that time, the government has never suggested that any such ties exist and has not moved to add Miraf to its list of Specially Designated Nationals. Instead, the government has justified its continued blocking of Miraf's accounts based on the belief that Miraf "may be connected to, affiliated with, or a part of the Barakaat network" or that the accounts at issue "may contain an interest of the Barakaat Network." See Exhibit C (letter from OFAC to Miraf dated Nov. 28, 2001.) As argued below, that belief is unsupported by the facts, and therefore, Miraf's accounts do not fall within the scope of the Blocking Order. Furthermore, as set forth in greater detail below, government officials working with the Federal Bureau of Investigations and the 9•11 Commission have since acknowledged that there is no evidence linking the Al Barkaat network and terrorism, and that OFAC has now concluded its investigation into this matter. Thus, the Blocking Order itself is not authorized under the law and should be rescinded.

**B.     Requests for Administrative Relief**

Miraf has made two prior unsuccessful attempts to obtain more limited administrative relief from the Blocking Order. These requests included an application to use funds from the blocked accounts to pay Mires debts, and a later request to use some of the funds to pay its attorneys' fees.

1.     2001 Application for a Limited License to Pay Outstanding Debts'

On December 28, 2001, Miraf, through its former counsel, Jeanette Freeman, submitted an application to OFAC for a license to use a portion of the blocked funds in the accounts for the limited purpose of paying its outstanding debts and financial obligations, including former counsel's legal fees. A copy of its application is attached (Exhibit D.) That application was never decided.

2.     2004 Request for a Limited License to Pay Attorneys' Fees2

On December 1, 2004, the undersigned counsel for Miraf, Fredrikson & Byron, P.A. ("Fredrikson"), sent a letter to OFAC requesting a limited license for attorneys' fees from one or more of the blocked accounts in connection with its legal efforts to unfreeze the accounts entirely (Exhibit E). Having received no response to this request, Fredrikson telephoned OFAC on January 18, 2005 and was routed to OFAC representative K. Margaret Cronk. Ms. Cronk confirmed that the request had been received and stated that future correspondence should refer to FAC number SDG-422. (See Exhibit F, letter to K. Margaret Cronk.)

On February 3, 2005, Fredrikson received a letter from David W. Mills of OFAC, which stated inaccurately that on December 20, 2004 a representative of his office had called and

---

OFAC has designated correspondence and documents associated with this license application under the following OFAC FAC numbers: SDT-197007; SDT-200295; SDT-201296; and SDG-208751.

[2] OFAC has designated correspondence and documents associated with this license request under the following OFAC FAC numbers: SDG-422, SDG-450, SDGT-450; and SDG-491.

requested a copy of Fredrikson's retainer letter with Miraf (no such request had been made), and that the license request would be reviewed as soon as a copy of the retainer letter was received. Fredrikson sent a letter enclosing a copy of the retainer agreement on February 8, the same day that it received Mr. Mills' letter. (Exhibit G.)

OFAC refused Miraf s request to unblock the accounts for purposes of paying its attorneys' fees on March 28, 2005. (Exhibit H.) No justification for this refusal was offered. Instead, under the apparent and very troubling misunderstanding that Miraf had been designated on the list of Specially Designated Nationals ("SDNs"), OFAC issued a highly restrictive "license," which not only denied access to the blocked accounts, but purported to prohibit Miraf from obtaining fees for legal services from any source within the United States. Since Miraf is a United States company and does not maintain accounts overseas, the "license" was of no benefit to Miraf whatsoever and would—in violation of the United States Constitution—effectively bar Miraf from paying for any legal representation.

This mistake suggests that OFAC responded without actually reviewing its own records concerning Miraf. Moreover, since Miraf is not an SDN, the purported restriction on receiving funds for legal services from sources within the United States (other than the frozen accounts at issue) is not authorized under any Blocking Order.

Fredrikson subsequently made a number of unsuccessful attempts to bring this error to the attention of OFAC representatives. Fredrikson sent letters to OFAC asking that its license request be reconsidered, based on a corrected record, on April 21, 2005 and (having received no response) again on July 21, 2005. (Exhibits I and J.) After no response to these letters was received, Fredrikson made a number of unsuccessful attempts to contact OFAC representatives by telephone during the months of September and October 2005. As of this date, OFAC has

failed to resolve—or even respond—to the license reconsideration request and other concerns set forth in the April 21, 2005 and July 21, 2005 letters from Fredrikson.

        3.      Current Application for Unlimited Unblocking of Funds.

      Through this Petition and the attached License Application, Miraf now requests that its accounts be unblocked in their entirety for the reasons set forth below. Because the instant License Application seeks a form of relief from OFAC that Miraf has not previously requested, it does not constitute a modification or request for reconsideration of any of its prior limited license requests. Miraf s filing of this application should not be interpreted as a withdrawal of its letter' requests for reconsideration of its request for a limited license to pay Frediikson's fees from the blocked accounts. Rather, those requests remains outstanding and OFAC's obligation to respond to them is continuing.

## DISCUSSION

## I.    Introduction and Summary .of the Argument

      Miraf seeks relief from the blocking of its accounts pursuant to under 31 C.F.R. part 501, subpart E (establishing procedures for the licensing and release of blocked assets), and 31 C.F.R. § 594.501 (stating that the procedures set forth in 31 C.F.R. part 501, subpart E, apply to assets blocked under the Global Terrorism Sanctions Regulations and Executive Order 13224). These regulations provide that any person whom OFAC has designated as blocked "may submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation." 31 C.F.R. § 501.807. A blocked person may also propose remedial steps which "would negate the basis for the designation." Id. The regulations further provide any person who is not designated as blocked, but whose accounts have been blocked inappropriately due to

mistaken identity, may request a release of the blocked funds on that basis. 31 C.F.R. § 501.806(a).

Mirafs accounts should be unblocked under both provisions. OFAC is mistaken in its identification of Miraf as being affiliated with, connected to, or a part of the Al Barakaat network, and has mistakenly identified its accounts as containing an Al Barakaat interest. See 31 C.F.R. § 501.806. In addition, OFAC has not designated Miraf as a blocked entity and lacks sufficient evidence to do so. Its ongoing designation of Al. Barakaat on the list of SDNs is also unsupported by the evidence. See 31 C.F.R. § 501.807.

Miraf never received a formal Blocking Notice from OFAC, but instead learned that its accounts had been blocked from the banks holding them. (See Exhibit K, November 7, 2001 letter from First Union National Bank). In a Request for Information sent to Miraf dated November 28, 2001, however, OFAC set forth its alleged legal justification for the blocking (see Exhibit C). In that letter OFAC stated that, pursuant to Executive Order Number 13224, and under the authorities granted by the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06 ("IEEPA"), it had "designated Al Barakaat and its affiliated group of companies... as entities that provide financial support or other services to persons who commit, threaten to commit or support terrorism . . . ." (Id.) The letter further stated:

> OFAC has reason to believe that Miraf International Inc. . . . may be connected to, affiliated with, or a part of the Barakaat Network. Furthermore, OFAC has reason to believe that [Miraf s First Union and Wachovia bank accounts] may contain an interest of the Barakaat Network. Therefore, on November 7, 2001, OFAC blocked these accounts pending an investigation and resolution of this matter.

Miraf denies these assertions and requests that OFAC unblock the accounts immediately. Miraf specifically bases its request on the following grounds:

1. Miraf is not connected to, affiliated with, or a part of the Barakaat Network, and Al Barakaat does not have any interest in the accounts. The accounts, therefore, do not fall under the scope of the Blocking Order or the justification set forth in OFAC's November 28, 2001 letter to Miraf.

2. OFAC has had sufficient time to investigate and resolve this matter and has, in fact, closed its investigation into this matter with no finding of any involvement by Miraf in terrorist activities. Since the investigation is no longer "pending," pursuant to OFAC's November 28, 2001 letter the accounts should be unblocked.

3. The Blocking Order itself is unjustified. United States government officials working with the National Commission on Terrorist Attacks Upon the United States (the "9-11 Commission") have reported that there is no evidence linking Al Barkaat and terrorism. The Blocking Order should be completely rescinded on these grounds.

For all of these reasons, Miraf s accounts should be unblocked and released in their entirety, without restriction of any kind.

## II.    The Blocking Order Does Not Apply to Mirafs Accounts.

According to the representations that OFAC made in its November 28, 2001 letter to Miraf, the two bank accounts at issue in this Petition were blocked because OFAC believed Miraf may be "connected to, affiliated with, or a part of the Barakaat Network" or that the blocked accounts "may contain an interest of the Barakaat Network." (Exhibit C.)

Miraf, however, is an independent, local S Corporation. (See Exhibit L, copy of Miraf s year 2000 tax return.) Al Barakaat owns none of its stock and has no interest in its property. Rather, Miraf is owned and controlled by Nasir Warsama (its President) and Ali Miraf (its Secretary). Neither Warsama nor Miraf has ever been an employee or owner of any company in,

or affiliated with, the Barakaat network. In the four years that have elapsed since the Blocking Order was issued, OFAC has never offered evidence or even suggested anything to the contrary. Thus, the assertion that Miraf may be an affiliate or part of the Barakaat Network is simply untrue.

Moreover, the blocked accounts are owned and controlled entirely by Miraf—not Al Barakaat or any of its affiliated companies. Under the terms of its contract with Al Barakaat, Miraf was required to pay a percentage of the fee earned on each wire transfer. (See Exhibit A.) Al Barakaat, however, earned no entitlement to that fee until the transfers to the intended recipients Were complete, and did not acquire an ownership interest in these funds until they actually reached its account in the UAE. Moreover, under the terms of the contract, if-Al Barakaat was not able to deliver the funds to the intended recipients, it was required to return the Money to Miraf within fifteen days. (See Exhibit A.) Miraf s contract with Al Barakaat did not give Al Barakaat any right or authorization to take funds from its Georgia bank accounts. Furthermore, in the years since the Blocking Notice was issued, Al Barakaat has never asserted any claim, right or interest in any of the funds presently held in Miraf s account. Thus, the assertion that the blocked accounts "may contain an interest" of Al Barakaat is also false.

The only relationship that Miraf ever had with any entity in the Al Barakaat network was its contract with Al Barakaat (Exhibit A). That business relationship was no different than that between Al Barakaat and any other company with whom it may have contracted, including, for example, the United States banks that held Al Barakaat's bank accounts before the Blocking Order was issued, or any utility companies that may have served Al Barakaat entities operating in the United States. OFAC has never sought to block the assets of any of these companies. The

contract between Miraf and Al Barakaat, therefore, does not constitute a sufficient connection with Al Barakaat to justify the blocking of Miraf's accounts.

Furthermore, that contract is no longer in effect and has not been in effect for many years. Indeed, Miraf took immediate action to sever its contractual ties with Al Barakaat as soon as it learned about the Blocking Order from the banks holding its accounts. On November 8, 2001, Miraf s owners executed a statement suspending its contract "until Al Barakaat clears its name from the list of those who have linkage with the terrorists." (Exhibit B.) Al Barakaat has not cleared its name from OFAC's SDN list. The contractual relationship between Miraf and. Al Barakaat thus no longer exists, and cannot support the continued freezing of Miraf s assets.

For the foregoing reasons, the facts do not support any of the possible reasons OFAC asserted for blocking Miraf's accounts. OFAC has misidentified Miraf as being an affiliate of, a part ,A or connected to the Al Barakaat network, and has misidentified its accounts as containing an interest of the Al Barakaat network. The accounts thus do not fall within the proper scope of the Blocking Order and should be released.

### III.    The Investigation Has Concluded with No Finding of Terrorist Involvement.

In the four plus years that OFAC has had to investigate Miraf's contract with Al Barakaat it has never asserted that Miraf knowingly supported or had ties with terrorists, and has brought forward no evidence supporting any such assertion. Miraf is not now and has never been listed in OFAC's list of SDNs. 31 C.F.R., ch. 5, app. A.

Furthermore, Miraf's swift and decisive action—in suspending its contract with Al Barakaat as soon as it received notice of the Blocking Order—contradicts any implication that such ties exist. (Exhibit B.) Miraf's decision to suspend the contract was voluntary. At the time that it did so, it had not even received formal notice of the Blocking Order from OFAC. In

suspending the contract, Miraf made clear that it does not support terrorism and that it would provide whatever assistance law enforcement officials deemed necessary to combat terrorism, stating:

> Our purpose is to serve the Somali Community in Georgia to send monthly support to their families in Somalia and Somali refugees diaspora all over the world. . . .We have nothing to do with terrorism in any form. We are against terrorism and [it] should be eliminated from the earth. We clarified to the law enforcements of what we do and offered our help to assist them what ever we can regarding the finding and the punishing of the terrorists.

Before the Blocking Order was issued, Miraf did not suspect—and had no reason to suspect—that Al Barakaat or any of its affiliated companies were involved in supporting terrorist activities. And as its actions and the foregoing statement make clear, it would not have conducted business with Al Barakaat had it had any cause to believe such a link existed. During the course of its investigation OFAC has never produced or even suggested that it is in possession of evidence to the contrary.

Moreover, it appears that OFAC's investigation into this matter has ended. Congress and the President appointed the 9-11 Commission to investigate the terrorist attacks of September 11, 2001, on November 27, 2002. P.L. 107-306. In executing its broad mandate, the 9-11 Commission appointed staff to draft and prepare a report to the Commission on terrorist financing. (See National Commission on Terrorist Attacks Upon the United States, "Monograph on Terrorist Financing: Staff Report to the Commission," hereinafter, "9-11 Commission Staff Report" or "Report", Introduction and Chapter 5 attached at Exhibit M.) This Report discussed the purported role of Al Barakaat in financing terrorist activities and the investigations that the FBI and OFAC had conducted into Al Barakaat. See id., ch. 5, pp. 67-86. The Report noted,

among other things, that "neither the FBI nor OFAC is attempting to continue to investigate this case." Id. at 84.

In its November 28, 2001 letter to Miraf, OFAC represented that it had frozen Mirafˈs accounts "pending an investigation and resolution of this matter." (Exhibit C.) Since it appears that investigation has concluded, and that it has produced no evidence of any link between Miraf and terrorism, no justification for continuing to block its accounts exists.

## IV.    The Blocking Order is Unauthorized and Should Be Rescinded.

Mirafˈs accounts should also be unfrozen because the Blocking Order itself is unsupported by the evidence and therefore, it is unauthorized by law. OFAC derived its purported authority to issue the Blocking Order from Executive Order Number 13224 (66 Fed. Reg. 49079), which the President executed on September 23, 2001 under the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06 ("IEEPA").

The President's enumerated (and therefore limited) powers under the IF,EPA permit him to deal with "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United states, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). This language does not permit the President to take action against any person who does not present an "unusual and extraordinary threat" to national security, foreign policy, or the economy. Citing such a perceived threat from terrorists not yet identified following the attacks on the World Trade Center and the Pentagon on September 11, 2001, the President issued Executive Order 13224, which empowers the Secretary of the Treasury to investigate, identify, and block the property interests of individuals and entities who have provided financial or other support to terrorists. See Executive Order 13224 § 1(d).

The Executive Order does not give the Treasury Department unlimited power to freeze assets without regard for whether there is any credible evidence that the affected persons have committed acts of terrorism, sponsored terrorism, or provided financial support to terrorists. Rather, blocking orders—like other administrative decisions—are subject to judicial review and may be reversed by the courts under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), if they are arbitrary and capricious and are not based on substantial evidence. See Holy Land Foundation for Relief & Development v. Ashcroft, 333 F.3d 156, 162 (D.C. Cir. 2003); Milena Ship Management Company, Ltd. V. Newcomb, 804 F. Supp. 846, 853 (E.D. La. 1992) (stating that an administrative decision is arbitrary and capricious when the agency has "offered an explanation for its decision that runs counter to the evidence before the agency.") Furthermore, the Secretary of the Treasury does not shoulder the responsibility to designate blocked parties alone, but rather, is required to base his designations of such persons "in consultation with the Secretary of State and the Attorney General." Executive Order 13224 § 1(d).

The Blocking Order that OFAC issued against Al Barakaat and its affiliates on November 7, 2001 on November 7, 2001 should be rescinded because is not based on substantial evidence. Moreover, its continuation does not appear to be supported by the Secretary of State or the Attorney General, with whom OFAC is obligated to consult on blocking issues under the terms of the Executive Order.

The 9-11 Commission Staff Report describes in detail the investigative efforts undertaken by U.S. government agencies in connection with Al Barakaat. The Report itself is based upon a thorough investigation conducted by 9-11 Commission staff, including review and analysis of FBI case reports and source reporting, face-to-face interviews with FBI officials, State Department cables, Department of Treasury memoranda, internal Department of Treasury

documents, and interviews with Department of Treasury and OFAC officials. See 9-11 Commission Staff Report at 69, n.63.

According to the Report, OFAC designated Al Barakaat as an SDN in November 2001, notwithstanding requests from various sources in the intelligence community that it wait, so that a more thorough investigation into the matter could be conducted first. 9-11 Commission Staff Report at 79. OFAC made the designation despite these requests, because it was under "substantial pressure to proceed with the designation as rapidly as possible." Id. Officials within the Treasury Department later acknowledged that; as a result of the government's haste, "some of the evidentiary foundations for the early designations were quite weak." M.

According to the Report, "this proved to be the case with the al Barakaat designations." Id. The United States intelligence agents assigned to investigate Al Barakaat following the 9-11 attacks "could find no direct evidence at all of any real link between JA11-Barakaat and terrorism of any type." Id. at 82-83 (emphasis added). In support of this conclusion, the Report quotes an FBI memorandum summarizing intelligence agents' trips to the UAE in connection with the investigation as follows:

> It has been alleged that the Barakaat Group of Companies were assisting, sponsoring, or providing financial, material, or other services in support of known terrorist organizations. Media and U.S. law enforcement reports have linked al-Barakaat companies and its principle manager, Ahmed Nur Ali Jumale, to Usama bin Ladin and bin Ladin's efforts to fund terrorist activities. However, this information is generally not firsthand information or it has not been corroborated by documentary or other circumstantial evidence that supports the allegation. For example, it has been reported that it is common knowledge in the United States-based Somali community that Al Barakaat is a money laundering operation backed by bin Ladin. It has also been reported that bin Ladin provided Mr. Jumale the initial financing to start the Al Barakaat businesses. At this time, these items of information have not been substantiated through investigative means.

Id. at 83-84 (emphasis in the original).

The 9-11 Commission Staff Report acknowledges that OFAC disagrees with the FBI's conclusions concerning the weakness of the evidence against Al Barakaat, but questions the credibility of the evidence upon which OFAC appears to rely, stating, "Intelligence community sources have informed Commission staff that the intelligence sources for much of the reporting regarding [A]l-Barakaat's connection to al Qaeda have since been terminated by the relevant agency as intelligence sources, based on concerns of fabrication." M. at 84 and n. 71.

Finally, the Report observes that as a result of various legal actions against OFAC by persons designated and blocked on November 7, 2001 based on their alleged affiliations with Al Barakaat, the Treasury Department was forced to modify its review processes as to the litigants at issue. According to the Report, OFAC analysts were required to review their files again and justify the designations with a showing that the litigants had actually supported terrorism, "rather than that he or she simply belonged to an entity that, overall, supported terrorism." Id. at 85.

The blocking of Miraf s accounts should be subjected to the same scrutiny. The November 28, 2001 letter to Miraf concedes that its accounts were blocked merely because OFAC believed it was "connected to, affiliated with, or a part of the Barakaat Network." As the Report indicates, such an alleged connection is not alone sufficient to justify the continued freezing of a blocked party's assets. Direct evidence of a link between the blocked party and terrorism must exist. Here, there is no such evidence.

Furthermore, whatever evidence may have used to justify the Blocking Order against Al Barakaat initially has now been called into serious doubt—so much so that the FBI has reported the alleged links between Al Barakaat and terrorism are "not substantiated." The continuation of the Blocking Order thus appears to be an arbitrary and capricious act of OFAC acting alone, and without the support of its sister agencies in the intelligence community. Because the Blocking

Order is not based on substantial evidence, it must be rescinded in its entirety.

## V.    **Other Legal Issues Are Reserved.**

In the event of any future judicial action, Miraf hereby reserves all other legal challenges that it might bring against the blocking of its assets, including, without limitation:

1.   That the blockings violate the rights of Miraf and its owners to procedural and substantive due process;

2.   That the blockings violate the rights of Miraf and its owners to Equal Protection under the laws; and

3.   That the blockings violate other provisions of the United States Constitution, international laws or treaties, the TREPA, Executive Order No. 13224, the Federal Regulations, or other statutes, regulations, or administrative authorities on grounds otherwise not specifically asserted herein.

## CONCLUSION

Based on the foregoing, and on the information provided in the enclosed License Application and Exhibits, Miraf respectfully requests OFAC to release the blocked funds in its accounts.

Dated:    June 14, 2006

RespectfullgSubmitted,

John W. Lund. I'st (MN #65286)
Dulce J. Foster (MN# 285419)
200 South Sixth Street, #4000
Minneapolis, Minnesota 55402-1425
Phone: (612) 492-7000
Fax: (612) 492-7077

**ATTORNEYS FOR MIRAF
INTERNATIONAL, INC.**

4013130_1 DOC

17

Alharakaat

March 17, 1998

UTEEDO: BESIISH

Waxaa haika• ku •,ad h      is dbo)cmaray Albarakaat iyoMiraf:
International Inc. Heshi&an Waxaa laga rabaa inIab⁴ada dhinacba dhowragii.
Heshiiskani waxaa ka koollan yabay qodobadan soo socda.

1. In Miraf lacagta ay ka qabato macaamiisha usoo ditto Albarakaat

2. in Albarakaat ku bixiso lacagta tnuddo ah 48 saacadood gudahood.

3. in Miraf International Inc. siiso Albarakaat 75% khidmadda laga qaado macaamiisha 25% kalena u hadho Miraf International.

4. In Miraf International lacagta ugu soo dirto Albarakaat xisaabtana ku soo xirto asbuuc gudihiis.

5. In qofkii la waayo Albarakaat ku soo celiso lacagtiisa 15 casho gudahood.

6. in qolo waliba iska diiwaan geliso waddanka ay ka shaqeeyaan.

7. In dhinac waliba dhowro nidaamka soo dhowaynta macaainiisha una jajabnaato adeegooda.

8. In dhinac waliba ka bixi karo heshiiska markii uu doono.

9. Inaan dhinacna la macaamilin waxna u dirin dadka ama lacag shaki leh.

Waxaa saxiixay:

Miraf International Inc.                                    Albarakaat

…………………………                          …………………………

………………………………                      ………………………

March 17, 1998

# Subject: Contract

It is stated here the contract between Albarakat and Miraf International Inc. Both sides are required to honor and follow the terms of the contract. The contract consists the following points.

1. Miraf International Inc. will receive and accept monies from the customers and it has to send instructions to Albarakaat with in 24 hours
2. Albarakaat has to pay the monies within 48 hours.
3. 75% of the service charge will collect by Albarakaat Company
4. Miraf International Co. will retain 25% of the fees from the customers
5. If the recipient of the money could not found, Albarakaat has to return that money in a 15 days time.
6. Both sides have to register in the country that they are operating.
7. Either side can cancel and break the contract whenever they wish.
8. Both sides should be very careful from dealing with monies from unknown sources.
9. Miraf International must wire the money through the banks and settle the accounts in every week.

Part 1

. . . . . . . . . . . . . . . . . . . . . . . . . . .

Albarakaat

Part 2

. . . . . . . . . . . . . . . . . . . . . . . .

Miraf **International Inc.**

**MIRAF INTERNATIONAL INC**
**424 NORTH INDIAN CREEK DRIVE**
**CLARKSTON, GA 30021**
**PHONE: 404-296-0104**
**FAX: 404-296-0174**

November 8, 2001

SUBJECT: IMMEDIATE SUSPENSION

      We, Miraf International Inc, are suspending our contract with Barako Trading Company (Al Barakaat) of United. Arab Emirates. In his annoucements, President George W. Bush stated on November 7, 2001 that Al Barakaat has link with the terrorists. Our purpose is to serve the Somali Community in Georgia to send monthly support to their families in Somalia. and. Somali refugees diaspora all over the world. Also, some of the neighbors of Somalia like Ethiopians, Kenyans and people of Djibouti use our transfer service. We have nothing to do with terrorism in any form. We are against terrorism and should be eliminated from the earth.

We clarified to the law enforcements of what we do and offered our help to assis.t them what ever we can regarding the finding and the punishing of the terrorists.

This suspension of the contract with. AI Barakaat will remain in place until AI Barakaat clearsits name from the list of those who have linkage with the terrorists.

Nasir Warsama ...... .46471-1       *arsama*,President

Ali K. Miraf      *tKA F* .....,Secretary


EXHIBIT
B



### 13EPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

### RE U/REMENT TO FURNISH INFORMATION

FAC No.SDT-197007P:

Miraf **Internation4** :Lac,                     NOV 2 8 2001
c/o Jeanette Freeirn
55 Marietta Stree6iLW,
Suite 1555
Atlanta, Georgia .3003

Gentlemen:

   The United S  tes Treasury Department's Office of Foreign
Assets Control    AC") administers a comprehensive sanctions
program and assets, freeze pursuant to Executive Order No. 13224
(66FR49079), ᵢₛₛᵤₑ by President Bush on September 23, 2001 (the
"Order"), and unde• the authorities granted by the International
Emergency Economic  Powers Act, 50 U.S.C. §§ 1701-06 ("IEEPA").

   On November    2001, pursuant to the Order, the Treasury
Department desigtat.ed-Al-Barakaat and its affiliated group of
companies (the "B4akaat Network") as entities that provide
financial support Or other services to persons who commit,
threaten to comMittor support terrorism (Specially Designated
Global Terrorist dtSDGT")). As such, all property and interest
in property of the Barakaat Network that are in the united
States, that hereatter, come within the United States, or that
are or hereafter *le within the possession or control of United
States persons, ar blocked. Blocked property may not be
transferred, withSaWn, exported, paid, or otherwise dealt in
without prior authOrization from OFAC.

   OFAC has reas6 to believe that Miraf international Inc.
("MIT") maybe co ':ected to, affiliated with, or a part of the
Barakaat Network. urthermore, OFAC has reason to believe that
MIl bank account nOmber 2080000575401 at First Union National
Bank, and bank account numbers 13361737, 2891.1216 and 25307528
at Wachovia Bank, ay: contain an interest of the Barakaat
Network. Therefor0,.on November 7, 2001, °FAO blocked these
accounts pending ai investigation and resolution of this matter.

   Pursuant to tie:Order, § 1702 (a) (2) of IEEPA, and § 501.602
of the Reporting aċid Procedures Regulations, 31. C.F.R. Part 501,
MII is hereby requgred to provide OFAC with a written report
concerning ₜₕᵢₛ mater. At a minimum, the report must. ᵢₙ𝒸ₗᵤdₑ -


EXHIBIT
C

2

information and re ords responsive to the following areas:

1. List and descri e All the types of business activities in which MII engags. For each type of business activity, provide mII's gross earnings for year 2000. Provide any supporting tax fecords, accounting records, or other financial records.

2. Describe the or agizational structure of MII. If applicable, describe the va rious divisions, or units of M1I, their functions, and tethods of operation.

3. Identify all names under which mui operates  or has operated in the past.

4. Provide the nate"s and addresses of all owners,  officers, directors, mana rs, and employees of MI1.

5. Provide a narra ive describing the legal structure between MI1 and the Barakaa   Network of companies. Include the address(es), phone number(s), and contact person(s) for all Barakaat Networ4 companies with which you share a legal relationship. f

6. Provide a narraive describing the financial and operational structure betwe MI1 and the Barakaat Network of companies. Tnc,lude the addqleds(es), phone number(s), and contact person(s) for a* Barakaat Network companies with which you share a financi  and operational relationship.

7. List the names    d addresses of all employees and owners of MIT who have ev    wOrked for the Barakaat. Network in any capacity.

8. To the extent y have not done so, if any entities (or persons) other han MII maintain a physical presence within your facility;    entify such entities. Describe the nature of the relationshi between MII and such entities and describe what type of ac .vities such entities are engaged in on the premises. Provi    the name(s), address(es),  and phone number(s) of su entities, their owners and their representatiVes.

9. Provide a list  te all past and present bank accounts maintained by M;Iand/or its owners (list the bank numbers, the name and ad 'Tess Of the financial institution, and the status of e  ch account). Provide a copy of the monthly

3

statement for ;each account during the past twenty-four months.

10. Provide copieagofall contracts, leases, or other written Agreements, ariii documents relating thereto, between MI1. (and/or its oWpers) and any other entity. Provide a written description oftanY oral agreements of similar nature between MIX and any other entity.

11. To the extent Snot: otherwise provided, provide all accounting, 4, and financial records pertaining to the operation of KItI that have been generated in the past twenty-four meths and all documents supporting these records.

12. Provide copies of all payroll records regarding the operation of 41 that were generated in the past twenty-four months.

0_4 Provide copieSipf.. all papers, tickets, notes, schedules, receipts, passtorts, and other documents reflecting domestic or internatior41 travel by Mii's employees, .owners, agents, representative, attorneys, officers or directors within the past twenty-four months.

14. For the past tWenty-four months, provide copies of all written corresOondence, notes, memoranda, books, records, receipts, ledgers, charts, and other documents related to or referencing t4 wire transfer .operations of MII or of any other entity c§nducting wire transfer operations on MII's business premiiies.

15. For the past twenty-four months, provide copies, of all documents relging to the transfer, receipt, deposit, -storage or traOsmittal of monetary funds by MII or by any other entity operating from MII's business premises. This requirement ir4ludes, but is not limited to, books, records in any form, iceipts, bank statements, bank deposit and withdrawal rectipts, money drafts, letters of credit, money orders, travelr's checks, cashier's checks, passbooks, bank checks, and other documents.

16. To the extent that MII controls or is in possession of information inthe form of. electronic data, compact, disc data, video ortaudio tapes, photographs, microfiche, microfilm, rolldex indices, address and telephone books, facsimile trarWnissiOns and reports, ledgers, records,

4

packages, receipts, invoices, notes, correspondence, memoranda, ch*ts," drawings, books, bank receipts, passbooks, cheOks- or other monetary instruments., relating to any of the items described in requests 1 - 15, provide a copy of eaCh..

If you have $ready provided all or part of the documents listed in this rectiirement as part of an, additional'federal legal process, please notify this office immediately.

Your report its due at OFAC within 20 business days from date of receipt ofd; this letter and should he addressed as follows:

U.      Department of -the Treasury
Of4ce of Foreign Assets Control.
Attt: 'Richard J. Hollas II
150p Pennsylvania Avenue, W.W. (Annex)
Was14ington D.C. 20220.

Depending on, ':he extent of .information contained in your response, a supplefilental requirement for information may be issued by this Offtce..

OFAC has licensing authority to help ameliorate the effect of the blocking. OVAC will consider requests for specific licenses to allow or payment from blocked accounts of outstanding finan4a1 obligations owed by MI1, such as salary, rent and utility p*yMents, as well as payment of attorneys' fees and expenses relatlid to legal representation of MIT in this matter.

Criminal penalties for violation of the Order and IEEPA range up to 10 yeas ih prison, $500,000 fine, for, corporations and $250,000 fine tor individuals. Civil penalties may be imposed by OFAC ugi,to $11,000 per violation.

Please be adv4sed that failure to respond may result in the imposition of civil penalties. If you have any questions, Please call mr. HOilas at (202) 622-2430./7

414

Sincerely,

Da id H. Harmon
Chief, Enforcement Division
Office of Foreign Assets Control

men' OF THE TREASURY

FOREIGN ASSETS CONTROL

ATION FOR THE RELEASE OF BLOCKED FUNDS

*.4 APPROVED.* THIS DOCUMENT BECOMES A
Sr.... FIC LICENSE AUTHORIZING THE UNBLOCKING
OF THE SUBJECT FUNDS AND THEIR RELEASE
ACCORDING TO THE TERMS HEREOF)

DO WIT WRITE DE⌐3 BOX– IICENSE APPROVAL ONLY VALK/ NCH °PAC 3r.At.

TH3 APPLICATION IS HEREBY:        FAGS -CENSENO.

G    App/eavEn..uo AMOS MAY BC UNCLOCKE0 /wo ⁹ammen. WITH VALUM
    G    To OMGMATCR OR ORIGINATING *BANK*
    •    im ACCOPSIMICIE    celoutAL. pAraeinlasneucnoias

    DENtal (SEEATTACMEG EGIE.ANATIONT

G    mutetect YEMCGT ACITON (SEE ASTACIEEIS CHECKLIST;

TYPE OF REQUEST [CHECK APPROPRIATE BOXj
21    LICENSE APPLICATION
    REQUEST FOR RECONSIDERATION(PROVIDE
    FAC NO. OF PREVICUS *AGENCY* =KM (IF KNOW141).

| ,hwacseta⁴'⁼"'-'='n. | ;Avommatamts | | ALICIENEMILINE | |
|---|---|---|---|---|
| Mitaf International Inc.. | 424 North Indian Creek Dr | | | |
| | STATE | CONTAGTPEPSION | | FAX MUMMER |
| Clarkston | Georgia | Nasir H. Warsama | 404-296-0104 | 404-296-0174 |
| POSTAL CODA | COUNTRY | SOCIAL SEGUNITY/TAXPAYER tn. No. tRaiftwou for cfS PonEoloci | *SAY&* ADOIRESS | |
| 30021 | USA | | Dhoodimeer @aol.com | |

CORPORATIONS AND OTHER ENTITIES

| PRINCIPAL PLACE OF BUSINES1 | STATE OF INCORPORATION OR ORGANIZATION | EMPLOYES ICENTIRCATION NUNBER |
|---|---|---|
| 424 North Indian Creel Dr. | Georgia | ▮ |

THE FOLLOWING INFORMATION, IP KNOWN, SHOULD BE PROVIOED CONCERNING    FUNDS    PAGE    N

| NAME A ADORER* OF ERNANCIALINIETMEDONWEICH BLOCKED FUNDS | AllCUla BLOCKED US $66,052.22 | GATE OPINE ELOCIONl3 11/07/01 |
|---|---|---|
| See attachment | | |
| RSCITTER NAME A AGORMIS | REMITTING NNANCIALENTEITUTION NNW A Amens | |
| See Attached | Clients monies received in form of cash and checks drawn on various banks. | |
| INTERMEDIARY nnucultInsimrrioncla Kum A ADORE= | SORPCSARY FMANCAL INIUMITION *MAIM* 4 ADORES* | |
| N/A | No financial institutes involved. Barakat Network delivers monies to reci | |
| SISIIM'RDARY NAME A ADORES* | OESGRIPTION OF UNGENLYSKS tnihnucnost (ATTACH SEPARATE SHEET A* MEMO | |
| See list provided | | |

nts.

APPLICATION CERTIRCATICiN: I, THE UNDERSIGNED, HERESY DECLARE THAT, TO THE BEST OF MY KNOWLEDGE. THE INFORMATION PROVIDED ON THIS APPLICATION AND ANY ACCOMPANYING DOCUMENTATION IS TRUTHFUL AND COMPLETE

| SIGNATURE | :GAM Or mains% | IDLE OF SIGNER | DATE PREPARED |
|---|---|---|---|
| \44.4(A- | Jki 4s(a- toot-t2s | ª..-5-ioari | 1-21 ⁼ᵏ O |

ADDITIONAL COPIES OF THIS FORM MAY BE OBTAINED FROM OFACS WEBSITE AT NO CHARGE: <titto://www.goviofac>

Name of address of Financial Institution of Blocked Funds:

I. Wachovia Bank, NA Atlanta East 4820 Memorial Drive, Stone Mountain Georgia 30083

2. First Union National Bank, 3860 Rockbridge road Stone Mountain, eargta730083

*The Remitters and Beneficiaries and their address (city) and telephone are provided, including the amounts being sent to relatives.

December 1, 2004

**<u>VIA CERTIFIED MAIL</u>**

Bob Werner, Director
U.S. Department of Treasury
Office of Foreign Assets Control
1500 Pennsylvania Avenue NW (Annex)
Washington, DC 20220

**Re: License Request of Fredrikson & Byron, P.A.**

Dear Mr. Werner:

This is to advise you that Fredrikson & Byron, P.A. ("Fredrikson") has agreed to represent Miraf International, Inc. in connection with matters related to the Blocking Order(s) issued against it in or around November 2001 based on its purported relationship to Al Barakaat.

By this letter, Fredrikson & Byron, P.A. requests that your office grant a license so that we may be paid for our legal services, past and future, provided to Miraf. These services will include representation of Miraf in matters related to the Blocking Order(s), investigating the amount and location of the blocked assets, counseling regarding the requirements of relevant law, legal assistance in dealing with federal law enforcement agencies, defending our client's blocked property, seeking de-listing, representation before OFAC, and any litigation that may result therefrom. Such a license is proper under 31 C.F.R. § 585.506, and may also be constitutionally required. At this time we request an initial license for the payment of $30,000 for these services.

We note that in 2002, Fredrikson & Byron sought and received similar licenses from OFAC for attorneys' fees in connection with Garad Nor, Aaran Money Wire Service, and Global Services International. We later succeeded in obtaining relief for our clients, including the unblocking of their accounts and removal of their names from the list of Specially Designated Global Terrorists. Moreover, 9-11 Commission staff recently published a Monograph stating that there is "no direct evidence at all of any real link between al-Barakaat and terrorism of any type." Our claims for relief thus have merit.

Bob Werner, Director
December 1, 2004
Page 2

Our' records indicate that OFAC blocked approximately $17,580 of Miraf assets held in
Wachovia Bank, Atlanta, GA (f/k/a First Union National Bank) Account Number
2080000575401, and approximately $48,470 held in Wachovia Bank Account Number
13361737. OFAC also may have blocked Miraf assets held other bank accounts not identified
herein. We request that the license be granted as to one or more of these accounts.

Please let me know as soon as possible if you request any other information or believe that a
separate form should be submitted in connection with this license request. I look forward to
hearing from you soon.

Very truly yours,

Dulce J. Foster
*Attorney at Law*
**Direct Dial:** 612 492.7110
Email: dfoster@fredlaw.com

DJF:j1b:3041894

cc:     Mr. Nasir Warsama
        John W. Lundquist, Esq.



January 18, 2005


U.S. Department of Treasury
Office of Foreign Assets Control
**ATTN: K. MARGARET KRONK**
1500 Pennsylvania Avenue *NW* (Annex)
Washington, DC 20220

Re: Fredrikson & Byron License Requests
            *Al Barakaat,* **Case No. SDG-414**
            *Miraf International, Inc. ,* **Case No. SDG-422**


Dear Ms. Kronk:

This is to confirm the substance of our telephone call this morning, regarding the status of Fredrikson & Byron's requests for licenses for legal services in connection with the above-referenced matters.

During the call you confirmed that OFAC had received the license request for Al Barakaat, Case No. SDG-414, and that the request had been processed and forwarded to your superiors for a final decision. You also confirmed that OFAC had received a copy of Fredrikson & Byron's retainer agreement with Al Barakaat, which we sent on December 22 at your request.

I inquired about the status of our request for information regarding the Al Barakaat blocking notice(s) and blocked assets, which we sent to OFAC on November 19, 2004 along with the license request. You indicated that your office had not received the request for information., and that it may have been forwarded to a different department. In our letter of November 19, we asked for copies of any blocking notices applicable to any of the Al Barakaat entities listed on "Attachment A" to our license request, as well as copies of the Annual Reports of Blocked Property or other information identifying the bank accounts and amount of blocked assets for these entities. We again request this information, to the extent that it *is* available from your office, as it *is* the minimum amount of information we need in order to file a full and complete application to lift the Blocking Order(s) against the Al Barakaat entities.

Attorneys & Advisors    Fredrikson & Byron,
main 612..492.7000    200 South Sixth Stree
fax 612,492,7077    Minneapolis, Minnesot
www.fredlaw.com    55402-1425

OFFICES: Minneapolis, London, & Monterrey, Mexico    AFFILIATES: Mexico City, Warsaw, Montreal, Toronto, & Vancouver

K. Margaret Kronk
January 18, 2005
Page 2


During our call you confirmed that OFAC had also received the license request for Miraf International. Fredrikson & Byron has not yet received an acknowledgement of this request from OFAC, but you indicated that it has been assigned to Case No. SDG-422. Please let us know if there is anything additional that you need in order to complete the evaluation of this license request.

I sincerely appreciate your attention to his matter. Please do not hesitate to call me with any questions or concerns.

Very truly yours,

Dulce J. Foster
*Attorney at Law*
**Direct Dial:** 612 492 7110
**Email:** dfoster@$edlaw,.com


cc:      John W. Lundquist, Esq.

DIF:j1b:#3068046\1

K. Margaret Kronk
January 18, 2005
Page 3


bcc: Mr. Nasir H. Warsama (via e-mail)
       Mr. Ahmed Jumali (via e-mail)
       Mr. Omar Muhammed (via e-mail)

# Fredrikson

February 8, 2004


VIA FACSIMILE & U.S. MAIL

David W Mills
Chief of Licensing
U. S. Department of Treasury
Office of Foreign Assets Control
1.500 Pennsylvania Avenue NW (Annex)
Washington, DC 20220

      Re:    License Request of Fredrikson & Byron, P.A.
               *Miraf International,*     – Case No. SDG-422

Dear Mr. Mills:

I write in response to your letter dated February 3, 2005, which we received this morning. In your letter you stated that on December 20, 2004, a member of your staff left a message requesting a copy of our signed engagement, letter with Miraf International, Inc. I believe you are mistaken. Although we did receive a voice message on December 20 from your staff, the call requested only the retainer letter for another of our clients, Al Barakaat (SDG-414), but made no mention of Miraf A copy of the Miraf engagement letter is now enclosed for your review

On January 18, 2005, having received no response from OFAC as to our license requests for either Al Barakaat or Miraf, I telephoned your office to inquire about the status of these requests. I was referred to K.. Margaret Kronk, who acko.owleged for the first time that our request as to Miraf had been received and a file number assigned. Ms. Kronk further confirmed that OFAC had received the retainer letter for Al Barakaat, but did not ask us to submit a copy of the retainer letter for Miraf. Ms. Kronk indicated that the requests for both entities were being processed and that a response from OFAC would be forthcoming.

As of this time we have not received any response to our license requests for either entity. We are hopeful that you will address these issues soon so that we may continue our work for these clients without substantial additional delays. Please let us know if you need any additional information in order to process these requests.

**Attorneys & Advisors**          Fredrikson & Byron,
main 612.492.7000          200 South Sixth Stree
fax 612.492.7077          Minneapolis, Minneso
www.fredlaw.com          55402-1425

MEMBER OF THE WORLD SERVICES GROUP          OFFICES



EXHIBIT

G

Mr.. David W. Mills
February 8, 2005
Page 2


Please do not hesitate to contact either John Lundquist (612-492-7181) or myself if you have any
further questions or concerns.

Very truly yours,

Dulce Foster
*Attorney at Law*
**Direct Dial: 612.492.7110**
**Email:** dfoster@fiedlawcom


DIF:j lb:3077452
Encl.
cc:     Mr. Nasir Warsama (via email) (without enc.)
        John W.. Lundquist, Esq. (without enc.)

# Fredrikson

Nicole M.Meen
(612)492-7320
imoen@fredlaw.com.

September 24, 2004

Mr. Nash Warsama
Miraf International Inc.
436-C North Indian Creek Drive
Clarkston, GA 30021

**Re: Miraf International, Inc.**

Dear Nasir:

This is to confirm our agreement to represent Miraf International, Inc. ("Miraf') in connection with the blocking notice that has resulted in certain of its bank accounts being frozen by the United States government, including those blocked by the blocking notice applicable to Al Barakat.

As we discussed, Fredrikson. & Byron is representing Al Barakat, and we are attempting to seek a. license from the Office of Foreign Assets Control ("OFAC") to get our attorneys' fees paid from blocked accounts. If we are successful in getting the license, then we will attempt to get the blocking order removed.

You have asked us to include blocked Miraf accounts with the list, of Al Barakat accounts for which we are seeking a license. As with the Al Barakat accounts, this is a significant undertaking for which we would require either a substantial retainer or confirmation that we could be paid from the frozen accounts. You have asked us to seek permission for the payment of legal fees from the frozen accounts. As a result, the scope of our representation will initially be very limited.

My normal hourly rate is $150; John Lundquist's normal hourly rate is $375. We will also have other lawyers work on the case as well. Our representation will be limited to seeking a license from OFAC for the payment of legal fees from the frozen accounts.

We agree to pursue a license from OFAC for the payment of legal fees but do not agree to take any action beyond that. If the license request is denied, we will be unable to provide any further legal services in the absence of a more substantial retainer. This could severely prejudice

Attorneys & Advisors    200 South Sixth Street
main 612.492.7000 Suite 4000
fax 612.492,,7077 Minneapolis, Minnesota
www.fredlaw.corn    56402-1425

OFFICES: Minneapolis, London    .AFFILIATES: Mexico City. WarsaW. Montreal,. Toronto. Vancouver

Mr. Nasir Warsama
Page 2
September 24, 2004

Miraf as once the process is initiated, the failure to follow through may result in the claims being dismissed or barred. On the other hand, if the license is granted, we will pursue both administrative remedies to unfreeze the bank accounts as well as litigation, if necessary. Our ability to pursue such claims will be limited by the extent of the license agreement for the payment of legal fees. We reserve the right to withdraw at any time if it appears to us that the ongoing payment of our fees is in doubt.

      I have enclosed our Agreement For Legal Services — Standard Client Billing Policy ("Agreement") which, along with this letter, establishes our agreement with you. The terms set forth in the attached Agreement apply to our relationship with you except to the extent modified by this letter. Please review the Agreement before signing and returning this letter.

      If this accurately describes our agreement, I would appreciate your indicating your concurrence on the <u>line </u>below. We look forward to providing competent and aggressive legal services to you and Miraf International, Inc.

      Sincerely,

      Nicole M. Moen.

Concurrence on behalf of
Miraf International, Inc.:

Nasir Worsama   Dated:   /0`3 2, 0 04
Nasir War sarna

Enclosure
NATIVI:mich

#3018483\1

# FREDRIKSON & BYRON, P.A.
## Agreement for Legal Services—Standard Client Billing Policy

This Standard Client Billing Policy, together with the engagement letter from Fredrikson & Byron, contains the agreement ("Agreement") under which Fredrikson & Byron will provide legal services to you, as the client named in that engagement letter.. This Agreement describes Fredrikson & Byron's standard billing policies and practices and will be applicable to all of your client matters *unless otherwise agreed in writing.* Fredrikson & Byron may periodically modify its general billing policies and practices without prior notice,,

*Services,,* Fredrikson & Byron will provide you the legal services described in the engagement letter and other services agreed to between you and Fredrikson & Byron. In the event of a conflict between this Agreement and the engagement letter, the engagement letter will control.

*Fees,* Unless otherwise agreed in writing, the cost of the legal services rendered will be based primarily on the amount of time expended and the applicable hourly rates of the person(s) rendering the services Our fee may also take into consideration other factors for determining the reasonableness of a fee, including but not limited to the novelty or difficulty of the issues involved, the amount involved and results obtained, the time limitations imposed, and the experience, reputation, and ability of the person(s) providing the service.. Time is recorded in one-tenth hour increments. Hourly rates are subject to periodic adjustment by Fredrikson & Byron without prior notice..

*Billing.* Unless otherwise agreed in writing, we generally bill fees, service charges and disbursements monthly.. Invoices are due and payable within thirty (30) days after receipt, Fredrikson & Byron may also send you monthly Statements of Account which summarize all outstanding amounts.. If you pay a retainer or other advance payment of fees, service charges or disbursements, Fredrikson & Byron will deposit that amount in and make withdrawals from a trust account as required under applicable rules of professional conduct..

*Termination.,* You are free to terminate Fredrikson & Byron's services upon written notice, and Fredrikson & Byron may withdraw its representation of you, at any time, in both cases without cause.. We may also withdraw our representation if you do not cooperate in the representation or pay our fees and expenses in a timely manner, or if we determine in our discretion that continuing to provide services would be unethical or impractical.. If you terminate Fredrikson & Byron or Fredrikson & Byron withdraws, all fees, service charges and disbursements incurred to that time will be due and payable; and we may also charge you a reasonable fee for the cost of copying, retrieving and/or transferring your files, papers, and property.

*Collection.,* You agree to reimburse Fredrikson & Byron for any collection costs and attorneys' fees incurred if we need to make efforts to collect payment of our invoices.. If invoices are not timely paid, Fredrikson & Byron may obtain and perfect an attorneys' lien against documents, property, money or other rights, in accordance with applicable law, Subject to applicable law and rules, A LATE PAYMENT CHARGE OF 8% PER YEAR (OR THE MAXIMUM ALLOWABLE RATE, IF LOWER) MAY BE ADDED TO ANY UNPAID INVOICE OVER THIRTY (30) DAYS PAST DUE.

*Questions or Disputes.* You should bring questions or disputes concerning our invoices to the attention of the attorney responsible for the legal services or Fredrikson & Byron's Finance Department within fifteen (15) days after receipt of the invoice. Formal dispute resolution procedures regarding fees are available through the Hennepin County Bar Association..

*Service Charges and Disbursements.* Except as provided below and unless otherwise agreed *in* writing, Fredrikson & Byron will charge you, without markup, itemized charges from outside vendors (e g.. filing fees, expert witness fees, telephone toll charges, postage and courier charges, travel, etc..) Charges for computer assisted legal research may include an additional service charge.

Certain specific charges shall be billed according to the following schedule, which is subject to periodic adjustment without prior notice: $.20/page for copying charges; $1 50/book for velo and spiral binding; and $1 00/page (plus any long distance telephone charges) for outgoing faxes,,

If Fredrikson & Byron contracts on your behalf for additional services to be provided by a third party vendor, you will be responsible for payment either directly to the third party or through Fredrikson & Byron.. Fredrikson & Byron may request a purchase order or other authorization from you..

*Confidentiality,* Fredrikson & Byron is required by applicable rules of professional conduct to protect your confidences and secrets, We will not disclose or use any confidential information we receive from you except as permitted by law and by applicable ethics rules.



# DEPARTMENT OF THE TREASURY
## WASHINGTON, D.C. 20220

**Case No. SDGT-450**                                         **MAR 2 2 2005**

John W. Lundquist, Esq. and Dulce J. Foster, Esq.
Frediikson & Byron, P.A.
200 South Sixth Street                                        **!LIAR 2 8 2005**
Suite 4000
Minneapolis, MN 55402-1425

Dear Mr. Lundquist and Ms. Foster:

This responds to your letters of December 1, 2004 and February 8, 2005, to the Office of Foreign Assets Control ("OFAC"), on behalf of Miraf International, Inc. requesting a legal services license. These transactions are subject to the Global Terrorism Sanctions Regulations, 31 C.F.R. Part 594 (the "Regulations").

OFAC has enclosed License No. SDGT-450 (the "License"), which authorizes FredriksOn & Byron to engage in transactions in connection with legal efforts to remove Miraf International, Inc. from the Specially Designated Nationals List and to unblock property blocked pursuant to Miraf International, Inc.'s designation. Please note that payments must not originate from a source within the United States or within the possession or control of a U S. person, including its overseas branches, and must riot be made from a blocked account or blocked property including the two Wachovia accounts identified in your letter of December 1, 2004. In addition, except as expressly authorized by the terms of the License, or otherwise by OFAC, nothing in the License authorizes the receipt of funds or other property, directly or indirectly, from any entity or individual whose property or interests in property are blocked pursuant to any Executive order or 31 C F.R. chapter V, including any entity or individual named or designated as a Specially Designated Global Terrorist pursuant to the Regulations or Executive Order 13224.

Sincerely,

$\int_A \phi cvh.$), Hmin n--e)-e-- ·

Robert W. Werner
Director
Office of Foreign Assets Control

Enclosure



## DEPARTMENT OF THE TREASURY
### WASHINGTON, D.C. 20220

**LICENSE No. SDGT-450**

### LICENSE

**(Granted under** the authority of 50 U.S.C. §§ 1701 *et seq.,* **50 U.S.C. § 1601 et** seq., 22 U.S.C. § 287c, Executive Order 13224, and **31 C.F.R. Parts 501** and 594.)

To: Fredrikson & Byron, P.A. (the "Licensee")
  200 South Sixth Street, Suite 4000
  Minneapolis, MN 55402-1425
  **Attn: John W. Lundquist, Esq. and Dulce J. Foster, Esq.**

1. Based on your letters of December 1, 2004 and February 8, 2005 to the Office of Foreign Assets Control on behalf of Miraf International, Inc. (the "Application"), the transactions and activities delineated on the reverse hereof are hereby authorized.

2. This License is granted upon the statements and representations made in the Application, or otherwise filed with or made to the Treasury Department as a supplement to the Application, or based on information available to the Treasury Department, and is subject to the condition, among others, that the Licensee complies in all respects with all regulations, rulings, orders and instructions issued by the Secretary of the Treasury under the authority of the International Emergency Economic Powers Act (50 U.S.C. §§ 1701 *et seq.),* the National Emergencies Act (50 U.S.C. §§ 1601 *et seq.),* section 5 of the United Nations Participation Act of 1945, as amended (22 U.S.C. § 287c), section 301 of title 3 of the United States Code, Executive Order 13224 of September 23, 2001, and the terms of this License.

3. The Licensee shall furnish and make available for inspection any relevant infaunation, records, or reports requested by the Secretary of the Treasury, or any other' duly authorized officer or agency.

**4. This License expires on** February 28, 2006, is not transferable, and is subject to the provisions of Executive Order 13244 of September 23, 2001, 31 C.F.R. Parts 501 and 594, and any regulations and rulings issued pursuant thereto. This License may be revoked or modified at any time at the discretion of the Secretary of the Treasury. If this License was issued as a result of willful misrepresentation, it may, at the discretion of the Secretary of the Treasury, be declared void from the date of its issuance or from any other date,

5. This License does not excuse compliance with any law or regulation administered by the Office of Foreign Assets Control or another agency (including reporting requirements) applicable to the transactions herein licensed, nor does it release the Licensee or third parties from civil or criminal liability for violation of any law or regulation,,

    Issued by direction and on behalf of the Secretary of the Treasury:

### OFFICE OF FOREIGN ASSETS CONTROL

By_____ -617( yr\ n  ₁₁   ✓e,/ MAR 2 2 2005
      Robert W. Werner
      Director

Attention is directed to 18 U.S.C. § 1001, 50 U.S.C. § 1705, and 31 C.F.R. Part 594.701 for provisions relating to penalties.

DT_MCE T FOSTER
Direct Dial No..
(612)492-7110
dfoster@fredlaw.com

April 21, 2005

Mr. Robert Werner, Director
U.S. Department of Treasury
Office of Foreign Assets Control
1500 Pennsylvania Avenue NW (Annex)
Washington, DC 20220

   Re: License Request of Fredrikson & Byron, P.A. – Case No. SDGT-450

Dear Mr. Werner:

   We are in receipt of your letter dated March 22, 2005, which enclosed a copy of License No. SDGT-450. This license states that Fredrikson & Byron, P.A. may receive payment for legal services in connection with efforts to unblock the bank accounts of Miraf International, Inc. ("Miraf").

   Although your letter purports to authorize us to receive legal fees on behalf of Miraf, you have denied our request for a license to receive the fees from one of the two accounts that we have identified as blocked, specifically, Wachovia Bank, Atlanta, GA (f/k/a First Union National Bank) Account Number 2080000575401, and Wachovia Bank Account Number 13361737.

   Your denial appears to be based on a substantial misunderstanding of the facts. Your letter states incorrectly that Miraf has been designated on the list of Specially Designated Nationals. To the contrary, Miraf has never been listed or in any way deemed a terrorist organization by the United States government. Fredrikson & Byron does not seek to remove Miraf from the SDGT list as your letter states, but rather, we represent Miraf in its efforts to unblock accounts that appear to have been frozen under blocking orders issued against the Al Bar akaat organization.

   Your unsupported assumption that Miraf is a blocked party is troubling. Based upon that erroneous assumption, you have "granted" a license to Miraf that—rather than giving it rights to legal fees that it did not already have—seeks to impose severe restrictions that are both unwarranted and beyond the authority of OFAC to impose. Specifically, the license purports to prohibit Miraf from obtaining legal fees from any source within the United States or within the

Attorneys & Advisors  Fredrikson & Byron,
main 612.4927000  200 South Sixth Stree
fax 612..4927077  Minneapolis, Minneso
www..frediew,,corn  55402-1425



MEMBER OF THE WORLD SERVICES GROUP  OFFICES

MI Bob Weiner
April 21, 2005
Page 2

possession or control of a U.S. person. Miraf, however, is not a blocked party and thus does not
need a license from OFAC to receive legal fees from any account other than the blocked
accounts that we have identified, and any other Miraf accounts we might identify in the future
that have been frozen pursuant to blocking orders against other parties.

      Please correct your records. Furthermore, please regard this letter as a request for
reconsideration of your decision in light of the fact that it was based on a misunderstanding of
the facts.

      We look forward to hearing from you soon.

Very truly yours,

Dulce J. Foster

DJF;j1b
cc:    Mr. Nasir Warsama (VIA E-MAIL)
      John W. Lundquist, Esq.

#3109130\1



DULCE 5. FOSTER
Direct Dial No..
(612)492-7110
dfoster@fredlaw. com

July 21, 2005

Mr. Robert Werner, Director
U.S. Department of Treasury
Office of Foreign Assets Control
1500 Pennsylvania Avenue NW (Annex)
Washington, DC 20220

Re: License Request of Fredrikson & Byron, P.A. – Case No. SDG-491

Dear Mr. Werner:

On April 21, 2005, I sent you a letter regarding our client, Miraf International ("Miraf"). Although we received an acknowledgement of receipt of that letter, dated May 2, 2005, a substantial amount of time has passed and you have not responded to the letter or our request that you reconsider Mires request for a license to pay legal fees from its blocked accounts.

In my letter, I advised you that your response to Miraf's license request was based on an apparent misunderstanding of the facts. Specifically, based on the license (No. SDGT-450) and the restrictions it contains, it appears you are operating under the erroneous belief that Miraf has been designated on the list of Specially Designated Nationals. In fact, however, Miraf has never been listed or in any way deemed a terrorist organization by the United States government.

Please review my April 21 letter, a copy of which I have enclosed for your convenience. Under the circumstances outlined in my letter, the license you have issued is inappropriate as it purports to apply restrictions that are inapplicable to a party such as Miraf, which is not itself a blocked entity. We ask that you redraft the license to correct the errors it contains. We further ask that you reconsider our request for a license to pay attorneys fees from the blocked accounts (Wachovia Bank, Atlanta, GA Account Number 2080000575401, and Wachovia Bank Account Number 13361737), since your initial determination was based on an apparent: misunderstanding of the facts.

While we are hopeful that you will give this request your full and fair consideration without 'substantial further delay, we will not hesitate to take further administrative or legal action if our concerns are not: addressed within a reasonable period of time.

Attorneys & Advisors        Fredrikson & Byron, P
main 612.492,,7000        200 South Sixth Street,
fax 612.492,,7077        Minneapolis, Minnesota
frecifav■Lcom        55409-1425



EMBER OF THE WORLD SERVICES GROUP        OFFICES

MI Bob Weiner
July 21, 2005
Page 2


We look forward to hearing from you soon.

Very truly yours,

Dulce J. Foster

D IF:jib
cc:    Mr. Nasir Warsama (VIA E-MAIL)
       John W. Lundquist, Esq.


#3146270\1

ATN: *ekGGM At)*



First Union National Bank
NC 5468
1525 W. T          Blvd.
Chadotto, NC 28288
704-427-2635

November 7,2001

Miraf International Inc
440 North Indian Creek Dr.
Clarkson, Ga 30021

Account #2080000575401

Dear Sir/Madam:

We are writing to inform you that a restriction has been placed on your account(s),
required by a mandate of the Office of Foreign Assets Control (OFA        division of the
U.S. Treasury Department, OFAC, administers a series of aws and regThations that
impose economic sanctions against certain countries, companies and individuals in order
to carry out U.S. foreign policy and national security objectives.

Your accounts will earn interest, but will remain blocked until OFAC approves the
resumption of normal banking activities

For further questions regarding the restriction on your account(s), please contact:

Office of Foreign Assets Control
ALUM Building
1600 Pennsylvania Ave. NW
Washington, D.C. 20220
Attn: Compliance Officer
(202) 622-2490

Since

Veronica Lee
Regulatory. Risk Control

Cc:Sheny Walsh-Manager
Cc,Lisa Cnigg- Team Leader

fi? A44471-
( v) 6J-ᵍ - 04/1/0
(goa) (0 9-        (-)49,(3)

1(13Z

Form **1120S**
U.S. Income Tax Return for an S Corporation
OMB No. 1546-0130

Department of the treasury
Internal Revenue Service

▶ Do not file this form unless the corporation has filed
For ▶ see separate Instruct/one.
to be an S corporation

**2000**

For calendar year 2000, or tax year Pe rem ____, 2000, & ending ____, 20 ____

| A Effective date of election as S corp. 09/01/1998 | use IRS label. Other- wise, print or Type: | Name, street, room/suit. no.; City/town, state, & ZIP code MI:RAP INTERNATION' 40 N INDIAN CREEK DRIVE Clarkston GA 30021 | C Employer Identification no. 58-2382536 • Date incorporated 03/20/1998 |
|---|---|---|---|

3 Sustness Cade no. (See instructions)
57.77

E Total assets (see instructions)
189 845.

F Check applicable oozes:   (1) ☐ Initial return   (2) ☐ Final return   (3) ☐ Change in address   (4) ☐ Amended return

G Enter number of snareholders in the corporation at end of the tax year .............................

Caution: include only trade or business income and ea arises on lines la through 21. See the Instructions for more information.

| I | N C O M E | 1a cross mikes or sates i 435, 263. | lb e asretumsand allowances | Call▶ | 1C | 435,263. |
|---|---|---|---|---|---|---|
| | | 2 CoSt of goods sold (Schedule A, line 8) | | | 2 | |
| | | 3 Gross profit Subtract line 2 from line lc | | | 3 | 435,263. |
| | | 4 Net gain (loss) from Form 4797, Part II, lino 18 (attach Form 4797) | | | 4 | |
| | | 5 Other income (loss) (attach schedule) • | | | 5 | |
| | | 6 Total income (loss). Combine lines 3 throu •.. 5 | | | 6 | 435 263. |

| D E D U C T I O N S | 7 Compensation of officers. | | 7 | |
|---|---|---|---|---|
| | 8 Salaries and wages (less employment credits). | | 8 | |
| | 9 Repairs and maintenance | | 9 | |
| | 10 Bad debts ...... ,.. ..... .. | | 10 | |
| | 11 | | 11 | 4,320. |
| | 12 rants and licenses ... | | 12 | 6,199. |
| | 13 interest.. | | 13 | |
| | 14a Depreciation (if required. attach Form 4562) . | 14a1 * | Pavic | |
| | Cl*PfeClattOn claimed on Schedule A and elsewhere on return . ...,. | 141?( | | |
| | c Subtract line 141:1 from line 14a | | 14c | |
| | 15 Depletion(00 not deduct cif and gas depletion.) ....... | | 15 | |
| | 16 Advertising.. | | 16 | |
| | 17 Pension,, profit-sharing. etc.. plans | | 17 | |
| | 18 Employer benefit programs. | | 18 | |
| | 19 Other deductions (attach schedule). | | 19 | 362,994. |
| | 20 Total deductions. Add the arrows: shown in the far right column for lines T through 19 ....... | | 20 | 373 523. |
| | 21 Ordinary income (loss) from trade or business activities. Subtract line 20 from line 6 | | 21 | 61,740. |

| T A X A N D P A Y M E N T S | 22 Tax; a Excess net passive income tax (attach SCItaddit).. ...... | 222 | | |
|---|---|---|---|---|
| | b Tax from Schedule ID (Form 11205),,.... ... ......... ...... | 22b1 | | |
| | C Add lines 22a and 22b (see the instructions for additional taxes). ...... | | 22c | |
| | 23 Payrnsnts: a 2000 est. tax payments & a unt applied from 1999 M. | 23a | 44, | |
| | b Tax deposited with Form 7004, , ,. . | 23b1 | | |
| | C Credit for Fetters' tax paid on fuels (attach Form 4136). | | | |
| | 4 Add lines 23a through 23c .... | | 23d | |
| | 24 Estimated tax penalty. Check if Form 2220 is attached . . . ................... ). O UN | | 24 | |
| | 25 Tax due. if the total of lines 22c and 24 is larger than the 23d, *nuer amount awed. See the instructions for depositary method of payment.................................... , li | | 25 | |
| | 26 Overpayment. if line 23d is larger than the total of lints 22C and 24, enter amount overpaid ...... D. | | 26 | |
| | 27 Enter amount of line 26 you want: Credited to 2001 Set, tax li **Refernded le** | | 27 | |

Sign Here
▶ Signature of officer _____ Date _____ r 118•
Under penalt as a century. I declare that I have examined this return. ... Wa nfasset aMa =41 4! ... has any knows 4e44.4"

| Preparer's Use Only | iPreparers I signature Firm's name (or yours if self-empto address. and Z Ode | IVAN & ASSOCIATES, LTD. 2793A CLAIRMONT ROAD Atlanta GA 30329• | Date Da 5/11, s | Check if serf- employed ☐ EIN 58-1910164 Phone no. | Prepares SSN or PTIN |
|---|---|---|---|---|---|

For Paperwork Reduction Act Notice. see the separate instructions.
CAA   0 1120S12   kar 32557   Oopyruhi 2000 Orsattit   eo LP • Fares 50t twee Only

Form 1120S (2000)


EXHIBIT

Terrorist Financing Staff Monograph

## Chapter 5

# AI-Barakaat Case Study

### *The Somali Community and al-Barakaat*

In about 1991, the East African country of Somalia became embroiled in turbulent civil-unrest that wreaked devastation on its people and institutions. Already destitute, the government collapsed and basic services withered. Famine and violence in the country were the norm, and a diaspora of Somalis began. Many arrived M the United States. In one of those strange flukes sometimes found in patterns of migration, cold and snowy Minneapolis has the largest concentration of Somali immigrants in the United States.

Somali immigrants, like individuals in immigrant communities throughout the United States, sought a safe, quick, and effective way to move money earned in the United States back to their families and homes. The need was even more dire for Somalia, as this was one of the only sources of hard currency available to the country. Many foreign workers in the United States have a number of different options to move money internationally. The most formal and obvious way is to use the established backbone of the international wire transfer system to shift funds between a bank account in the United States and one in the destination country. This method has several significant advantages. It is safe and convenient, particularly when large amounts of money are being sent between commercial customers. There are drawbacks to wiring money, however: it can be expensive; banks can hold the money for extended periods before sending it; it requires a bank account in the United States; and the banks are required to use the official exchange rate and in some countries levy a tax on foreign exchange, which often makes the effective rate of exchange punitively high. Indeed, other countries often restrict the export of foreign currency and foreign exchange.

However, for Somalis living in the United States, the question was moot. Somalia simply had no banking system and no central bank by which foreign exchange could be made. Thus, a different way had to be found to get money to Somalia. The al-Barakaat network of money remitters was set up to address this need. Founded by Ahmed Nur Ali Jumale in 1985, al-Bar akaat at the time of 9/11 had more than 180 offices in 40 countries, all existing primarily to transfer money to Somalia. The financial headquarters for al-Barakaat was in the United Arab Emirates, where Jumale had opened a number of accounts at the Emirates Bank International (EBI) to facilitate the transmission of money. At the time of the terrorist attacks, al-Barakaat was considered the largest money remittance system operating in Somalia; in addition to being used by a significant number of Somalis who had fled the anarchy in their home country, it was the primary means that the United Nations used to transmit money in support of its relief operations there..

A money remitter, described most simply, collects money from an individual at one point and pays it to another in another location, charging a fee for the service. The money itself does not actually move; rather, the originating office simply sends a message to the destination office, informing it of the amount of money and the identity of the sender and

National Commission on Terrorist Attacks Upon the United States

of the recipient. The destination office then pays the ultimate recipient. To settle, money is periodically wired in aggregate amounts from the originating office's bank account either to a central clearing account owned by the money-remitting company or through correspondent bank accounts. The central office, in turn, settles with the destination office. Each office is typically an agent or licensee of the main office, and its relationships are usually arm's-length and governed by a written contract. The main office is responsible for keeping track of the settling transactions with all of the other offices. Most money remitters in the United States belong to large franchise, such as Western Union or MoneyGram. They effectively operate along the same principles as al-Barakaat, albeit more formally. Additionally, the absence of any agents for large, Western-based money remitters in Somalia forced Somalis to use smaller, ethnically based ones.

Al-Barakaat has been commonly called a hawala, but it is not one. [61] There are similarities between the two systems.. In both, there is a need to compensate the agent who has paid out money pursuant to a money transfer. In both, the money is not sent for each individual transaction; rather, there is a larger settling transaction conducted periodically to adjust for the differences in what each office took in and what it had to pay out.

The key difference is in how the money or value moves between the office obtaining the money from the customer and the office paying the money out to the ultimate beneficiary. In transferring value between the sending and the receiving offices, a money remitter uses the formal financial system, typically relying on wire transfers or a correspondent banking relationship.. A hawala, at least in its "pure" form, does not use a negotiable instrument or other commonly recognized method for the exchange of money. Hawaladars instead employ a variety of means, often in combination, to settle with each other: they can settle preexisting debt, pay to or receive from the accounts of third parties within the same country, import or export goods (both legal goods, with false invoicing, or illegal commerce, such as drug trafficking) to satisfy the accounts, or physically move currency or precious metal or stones.

There are other distinguishing characteristics of a hawala. Many hawalas operate between specific areas of the world, or even specific areas within a specific country. An individual wanting to send money from Canada to one area in Pakistan, for example, might use one hawaladar; to move money to a different part of Pakistan, it may be necessary to use a different one. Hawalas typically do not maintain a large central control office for settling transactions. Instead, a loose association of hawaladars conduct business with each other, typically without any formal or legally binding agreements.. Hawaladars often keep few formal records; those that do exist ate usually handwritten in idiosyncratic shorthand and are typically destroyed once the transaction is completed.

As noted in chapter 2, Usama Bin Ladin. and al Qaeda made significant use of hawalas to move money in the Middle East—particularly in Pakistan, the UAE, and Afghanistan—in

---

[61] The following discussion is aided by two reports, both produced by FinCEN: *A Report to Congress in Accordance with Section 359 of the USA PATRIOT Act,* (2002) and *Hawala: the Hawala Alternate Remittance System and its Role in Money Laundering,* (undated, probably 1996)

Terrorist Financing Staff Monograph

the period before 9/11. This does not make the use of hawalas inherently criminal, although it has been recognized that some of their characteristics allow criminal activity to flourish: little formal record keeping, lack of government controls, and settling transactions that do not go through formal financial channels.

The Somali money remitters in Minneapolis had attracted official attention for some time. There were three primary remitters in Minneapolis in the late 1990s: al-Barakaat, Dahb Shill, and Shirkadda Xawilada Amal. Al-Barakaat had by far attracted the most attention. A local bank had filed Suspicious Activity Reports (SARs) [62] as early as the summer of 1996 with the Treasury Department regarding what they believed to be suspicious financial activity: large amounts of cash and other instruments were being deposited and then immediately wire transferred to a single account in the UAE the next day. The SARs did not describe what the bank thought the nature of the activity was, just that it seemed inconsistent with normal banking activity. By 9/11, these reports numbered in the hundreds.

The FBI, which received a regular summary of these reports, opened a criminal money-laundering case file on al-Barakaat in May 1997.[63] In a typical money-laundering investigation, an investigative agent tries to develop evidence that the money was derived from a crime that was statutorily described as a "specified unlawful activity" (SUA), and that the purpose of the transaction was either to disguise the nature, source, ownership, or control of the money or to further the criminal activities. The difficulty here, which would plague both the intelligence and criminal investigators for the rest of the investigation into al-Barakaat, was that the transactions themselves revealed neither who the recipient of the money was nor what happened to the money once it arrived in the UAE. The source of the money or purpose behind the transaction could be legitimate or nefarious: in the absence of further information, it was impossible to know which. After a preliminary investigation, the FBI closed its criminal investigation of al-Barakaat in August 1998, unable to find an SUA or gain an understanding of the purpose of the transactions. More SARs continued to pour in, however, and U.S. Customs and Internal Revenue Service agents in Minneapolis, who had opened a separate investigation into al-Barakaat, continued to investigate.

---

[62] Suspicious Activity Reports and their role in the overall scheme of anti-money laundering regulation of banks and other financial institutions are discussed in chapter 4..

[63] The description of the FBI intelligence and multi-agency law enforcement investigation against al-Barakaat was derived from a review of FBI case reports and source reporting, as well as face to face interviews with the agents and FBI officials involved The description of the government's understanding of al-Barakaat prior to 9/11 was derived from a review of intelligence agency reporting. The description of the foreign government participation in the al-Barakaat action is derived from State Department cables and Treasury memoranda. The discussion of OFAC is derived from review of internal Treasury documents and from interviews of Treasury and OFAC officials

## *The Early Intelligence Case*

The primary domestic investigation of potential Somali-based terrorist activities occurred in Minneapolis.[64] The lead case agent was able to develop intelligence both from his own investigative efforts and from his review of the materials in the possession of the CIA. In December 1998, a case agent in the intelligence squad in Minneapolis developed a source of information on the activities of the Somali community. The source indicated that the terrorist group Al-Itihaad Al-Islamiya (AIAI) had a cell in Minneapolis, and that it supported radical Islamic activities against the United States. The investigation focused on a specific individual within the United States, who was alleged to have plotted to bomb U.S. embassies in Uganda and Ethiopia and to have been engaged in fund-raising in Minneapolis to support AIM activities overseas. Additionally, the source provided information regarding about 15 Somali immigrants. After further inquiry, including searches and an interview, the investigations were closed when it was found that the FBI's original source lacked credibility regarding this specific threat and that other reliable sources had no knowledge of the suspected plotter.

While the original source did not pan out, the agent was able to learn from his contacts in the intelligence community, particularly the CIA, a great deal about AIAI. The agent learned that AIM operated primarily in East Africa and was considered a loose affiliation of Islamists. AIM was considered a significant threat by the Defense Intelligence Agency, which had experience in Somalia during the early 1990s, and intelligence suggested that AIAI had links to Usama Bin Ladin. For example, there were indications that Usama Bin Ladin had visited Somalia and visited an AIAI stronghold in southern Somalia to look for a new base of operations when his stay in Sudan ended. Bin Ladin purportedly met with the leaders of AIM as well, and was said to have given AIAI $400,000 in 1997 to support attacks on Ethiopia. Some of this intelligence was reinforced after 9/11, when it was reported that MAI discussed hiding Bin Ladin in the event he needed to leave Afghanistan.

Despite these troubling links, the State Department thought MM did not meet the standard for designation as a Foreign Terrorist Organization (FTO), which would have the effect, among other things, of criminalizing support of it. Additionally, there was a concern on the part of the State Department that some of the reporting involving AIM was simply not credible. State said that multiple reports from the CIA discredited its earlier sources.

In the late 1990s, the intelligence community also began to draw links between AIM, al-Barakaat (particularly its founder, Ahmed Nur Ali Jumale) and Usama Bin Ladin. The reporting centered on a few key facts. First, it alleged that Usama Bin Ladin not only assisted Jumale in establishing al-Barakaat in about 1992 but was in fact a silent partner, and that Jumale managed Bin Ladin's finances as well This was consistent with other information that indicated a prior relationship between Jumale and Bin Ladin. Second,

[64] The first FBI investigation on AIM and al-Barakaat was started in San Diego in October 1996, on an individual investigated as a result of his connection with HAMAS

Terrorist Financing Staff Monograph

the reporting indicated that al-Barakaat was associated with AIAI, in that al-Barakaat managed the finances of AIAI, and AIAI used al•Barakaat to send money to operatives. Variations of that reporting stated that the head of al-Barakaat, Jumale, was part of the AIAI leadership, or that Usama Bin Ladin used al-Bar akaat to fund AIAI Third, there were allegations that al-Barakaat actually assisted in procuring weapons for AIAI or sold weapons to ALAI. There were specific reports, for example, of al-Barakaat's supplying Somalia's Sharia court with 175 "technicals" and 33 machine guns between January and mid-July 2000, and AIAI with 780 machine guns, which it had procured from sources in China and Chechnya. Other reporting indicated that al-Barakaat was founded by members of the Muslim Brotherhood in order to facilitate the transfer of money to terrorist organizations, including Hamas and AIM.

Lastly, there was fairly detailed information from a U.S. embassy in Africa in July 1999 Two sources known to the embassy claimed that Usama Bin Ladin was a silent partner and frequent customer of al-Barakaat. One of the sources further related that Bin Ladin gave Jumale \$1 million of venture capital to start al-Barakaat, and that terrorist funds were intermingled with the funds sent by NGOs. A third source told the embassy that al Barakaat did not practice any kind of due diligence in making financial transactions. Both sources claimed that al-Barakaat security forces supported Usama Bin Ladin by providing protection for Bin Ladin operatives when they visited Mogadishu. The embassy cautioned that the allegations could not be confirmed and noted the risk that the sources may simply be spreading negative information about their rivals.

The Minneapolis FBI intelligence agent continued to develop sources and investigate the activities of the Somali community. By July 1999, he was able to open a "full field investigation" (FFI) into ALAI as a group All FBI FFIs require predication: that is, some evidence must already exist to give the FBI reason to believe that an individual is involved in activities on behalf of a foreign government or terrorist organization, which would justify further surveillance or intelligence collection. This requirement, which prevents the FBI from undertaking random domestic intelligence collection on individuals, was introduced as a way to protect civil liberties. An FF1 can be instituted after a preliminary investigation (PI), which is opened to determine whether an FFI is justified. A PI can be opened only for a limited time, and agents in a PI are restricted in their methods of collecting intelligence.

When they opened the AIAI investigation, the Minneapolis agents saw it as "purely intelligence gathering." They simply wanted to learn whether AIAI was operating in the United States and, if so, determine the nature of its activities (such as fund-raising, logistics, or operations).. There was no attempt to build a criminal case in the traditional sense, nor was any effort given to developing probable cause, the standard that criminal case agents typically work toward. They were interested in developing probable cause that specific individuals were agents of a foreign power or the particular communications were to be used in the furtherance of terrorist activities, the standard used to obtain a FISA warrant.

National Commission on Terrorist Attacks Upon the United States

## *Considering a Criminal Case*

The intelligence agent knew of the SARs and knew that al-Barakaat was closely tied into the Somali network in Minneapolis. Moreover, the intelligence agent knew what the federal criminal agents investigating the money-laundering claims did not: intelligence reports tied the al-Barakaat network to AIAI and Usama Bin Ladin. As a result, the intelligence agent thought that it would be useful to open a criminal case on al-Barakaat. This was a matter of some controversy, as there was a fairly rigid rule within the FBI and Department of Justice against mingling intelligence cases and law enforcement cases. In the jargon of the day, this prohibition was known as "the wall," and it was the source of considerable confusion among agents in the field. Working-level agents understood that headquarters frowned on having simultaneous criminal and intelligence cases, although it was hard for them to articulate why.

Opening a criminal case to complement the intelligence case would have several advantages, however, if the agent could get the approvals. First, criminal charges could be threatened against subjects, providing motivation for them to cooperate in furthering the intelligence investigations. Equally important, a criminal case would give the intelligence agent far better tools to investigate al-Barakaat and the suspected AIAI members in Minneapolis. These tools included grand jury subpoenas to obtain bank records. Grand jury subpoenas were far preferable to National Security Letters (NSLs), the method for obtaining documents in intelligence investigations, because the FBI could obtain subpoenas almost instantly, whereas NSLs took 6 to 12 months to be issued.65 Outside of the New York Field Office, which had its own procedures, NSLs could be approved only at FBI headquarters and had to be signed by a supervisor.

Additionally, the intelligence agent wanted to brief the Assistant U.S. Attorney (AUSA), the local federal prosecutor in Minneapolis, on the intelligence investigation. He thought that it would be useful for the prosecutor to obtain an understanding of the context and motivation for the criminal case. From past experience the agent believed that the U             Office would not get involved in a criminal spin-off of an intelligence case unless FBI headquarters approved the transfer. And he also knew from past experience that because the potential criminal charges evident at that time were relatively minor, the U.S. Attorney's Office would not be interested unless the prosecutors were briefed on al-Barakaat's terrorist connections. 66 As a result, the agent applied for permission to brief the AUSA on the case.. He did not receive this approval for 13 months—many months after the FBI Director himself took a personal interest in the case.

The FBI Radical Fundamentalist Unit (RFU) at headquarters, responsible for approving this briefing, initially opposed it.. The RFU did not see it as necessary and questioned whether the evidence was strong enough to justify breaching the wall between criminal

---

[65] According to the intelligence agent doing these types of investigations, this delay no longer exists, and NSLs can be obtained just as fast as grand jury subpoenas..

[66] The most obvious crime was "structuring financial transactions " The crime consists of breaking apart cash bank deposits into increments of less than $10,000, so that the bank does not file a form identifying such depositors to the Department of the Treasury..

Terrorist Financing Staff Monograph

and intelligence cases. At the time, FBI headquarters required greater evidence to brief the U.S. Attorney's Office on an intelligence case than it did to open an intelligence full field investigation, and headquarters did not think the evidence regarding the AIAI case had reached the requisite level. In the Minneapolis intelligence agent's view, headquarters viewed Minneapolis as excessively aggressive in pushing the limits of the wall and may have been more cautious in this case as a result.

According to the Minneapolis intelligence agent, the RFU thought the case was not strong for a number of reasons. First, the RFU supervisor did not believe AIAI was a threat to the United States and questioned whether AIAI, with its decentralized command structure, was really a group at all. Moreover, AIM had not been designated a foreign terrorist organization by the Secretary of State. This was a significant point because without that designation, it was not a crime to give AIAI material support (absent evidence that the support went to carrying out a specific terrorist attack). As for al-Barakaat, the RFU thought that the information about connections with al Qaeda was dated; also, it pointed out, there was no evidence that any of the Somalis who used al-Barakaat to remit funds did so with the intention of supporting terrorism. The agent agreed that all of these allegations remained unproven and required further investigation, but he wanted to brief the AUSA to obtain better tools to find out the truth.

While waiting for the approval to brief the AUSA, the Minneapolis intelligence agent came to learn of the IRS and U.S. Customs investigation, and in October 1999 he met with those involved. The FBI opened a criminal investigation in November 1999. The agents agreed to work together, along with the Immigration and Naturalization Service, to see whether they could make a criminal case. Multiagency cooperation has become common in large criminal investigations, as each agency brings its unique skills to bear: the FBI provides resources and investigative experience, the IRS has a reputation for very well trained and skilled financial investigators, Customs has the ability to control the borders, and INS brings to bear its authorities to enforce the immigration laws (critical to developing witnesses in investigations of this type).. Moreover, a joint case makes possible information sharing, as each agent can search his or ' her own agency's database and communicate the results to the group.

Ultimately, following several meetings by officials in Washington, the Minneapolis FBI received approval to brief the AUSA in December 2000 on the connections between the criminal violations and the larger intelligence issues, which it did. It thereafter enjoyed an excellent relationship with the U.S. Attorney's Office in Minneapolis.

The strategy in the criminal case was to try to gather evidence and gain an understanding of where the money was going once al-Barakaat sent it, and thus to determine whether it was being used to support terrorism.. The focus was on the employees and owners of the three al-Barakaat outlets in Minneapolis. Part of the mission of the criminal case would be to support the intelligence case. At the time, the investigators were "still trying to find out what we had.." The criminal FBI agent (the criminal case had to have a separate investigator because of "wall" issues, although both agents worked in the same

National Commission on Terrorist Attacks Upon the United States

intelligence squad) was looking more toward a "nickel-and-dime fraud case." There did not seem to be enough evidence to make a pure terrorist-financing case.67

One difficulty was that it was almost impossible to follow the money once it left the United States. All of the transfers went to the UAE, and there the investigators lost the trail. To pick it up again, they would have to get records from the bank the money was being wired to—the Emirates Bank International in Dubai. But U.S. law enforcement could not simply ask the EBI for the records. Rather, the agents would have to ask the government of the UAE to ask the EBI for the records. Then, the UAE could turn the records over to the United States. Obtaining records from a foreign government is a long and cumbersome process, filled with potential pitfalls. To begin with, there is no guarantee that the foreign country will even consider the request, particularly in the absence of a treaty requiring such cooperation. Each country has its own notions about bank secrecy and many jurisdictions resist opening up their records to another country. Even if the foreign jurisdiction agrees in principle to the request, it must be persuaded that the United States has a legitimate need for the records and is not merely undertaking a fishing expedition. This showing may require the disclosure of sensitive information to a foreign government, and the United States may not necessarily be able to trust that government or have confidence in its control over the further dissemination of the information. Thus, an agent conducting such an investigation has to balance the need for the records against the possibility of disclosure.

Al-Barakaat was moving significant amounts of money overseas, and to the Minneapolis criminal case agent, it seemed improbable that the relatively low-skilled Somali community in Minneapolis, although large, could have amassed so much money through legitimate wages.. In early 2001, al-Barakaat was transferring as much as $1,000,000 through its Minneapolis facilities. The agent believed that some of that money must have been derived from fraud.


## The Other Field Offices Pick Up the Investigation

In the meantime, other FBI field offices were finding similar al-Barakaat activity. By the summer of 1999, the FBI knew that there were al-Barakaat offices in San Diego, Washington, D,.C., and Minneapolis, and Minneapolis was actively polling other cities to determine the links. Seattle opened a case in December 1999, and by February 2001 had developed a source who reported that "apparently" al-Barakaat fees were used to fund AIAI. The FBI field offices coordinated with each other, and ultimately held

---

[67] The central terrorist financing crime is called "material support," in violation of 18 U..S..C. 2339B.. This requires the knowing contribution of something of value (it need not be money) to an organization that has been listed as a Foreign Terrorist Organization by the Secretary of State. It is an extraordinarily broad statue, in that prosecutors need not trace specific money to a terrorist act.

[68] A review of the FBI files in the case revealed a substantial amount of secondary reporting. The most valuable intelligence is from first hand witnesses: individuals who can report something based on personal experience.. There were few sources who could do this regarding al-Barakaat,, Rather, most of what was collected was information that others had heard. The line between intelligence and rumor mongering can be quite thin, and great care needed to be taken to evaluate that information for what it was,.

Terrorist Financing Staff Monograph

multidistrict meetings in April 2000 and May and June 2001. Unlike in other cases, however, there was very little to coordinate: each al-Barakaat office appeared to be operating independently, with the EBI account in the UAE serving as the only link between them. By 9/11, there were FBI investigations in Charlotte, Cincinnati, New York, Seattle, San Diego, and Washington, D.C.

Al-Barakaat also had attracted the attention of the Financial Crimes Enforcement Network (FinCEN), the Treasury agency established to review and disseminate suspicious activity reports submitted by banks and other financial institutions. In December 1999 (about four months after the FBI was reporting that al-Barakaat had ties to Bin Ladin and offices in at least three U.S. cities), a FinCEN analyst reviewing intelligence community cables noted a reference to al-Barakaat along with the identification of a specific account in the UAE. The analyst recalled that a co-worker the previous month had noted an anomaly in reviewing al-Barakaat SARs. FinCEN analyzed the al-Barakaat SARs and, in February 2000, briefed FBI headquarters concerning the results. By March 2000, FinCEN had prepared a report and link-analysis chart highlighting the connections between the al-Barakaat entities and the UAE accounts. Still, no one knew the purpose behind the money transfers, the source of the money, or the ultimate destination. To get to the source, the agents would have to locate informants in the community who could tell them; to understand the ultimate destination of the money, they would need access to the records within the UAE..

The FBI had a number of informants who could tell them about al-Barakaat. The criminal case agent, in the course of the criminal investigation, had found two confidential sources who were reporting that al-Barakaat was siphoning money to AIAI. The sources also indicated that to be an al-Barakaat representative, one also had to be a member of AIAL But the criminal case agent's sources had no direct knowledge of these claims; they were simply repeating what was purportedly common knowledge within the Somali community.

In conjunction with members of the intelligence community, the intelligence agent also worked two sources who could speak out of personal knowledge. These sources were able to travel and provide intelligence on AIAI and the situation in East Africa. His sources claimed direct contact with senior al-Barakaat management. Much of the reporting, however, concerned AIAI in Somalia; there was less on the local AIAI cells within the United States, or on the relationship of al-Barakaat to either AIM or Usama Bin Ladin.

Nevertheless, the statements of these two sources did corroborate information regarding the relationship between al-Barakaat, al Qaeda, and MAI. The sources contended that at the direction of senior management, al-Barakaat funneled a percentage of its profits to terrorist groups and that UBL had provided venture capital to al-Barakaat founder Ahmed - Jumale to start the company. The agent believed these sources, because they had been vetted and the information they were providing was consistent with intelligence he had previously received.. Moreover, the intelligence agent believed that relationship of these

National Commission on Terrorist Attacks Upon the United States

sources to al-Barakaat management was such that the sources would have firsthand knowledge of al-Barakaat's activities,.

## The September 11 attacks

After the attacks, "all bets were off" The al-Barakaat criminal team—the FBI, U.S. Customs, and the IRS—which had been working in separate offices received space to work together. More agents were assigned. Moreover, they contemplated bringing criminal charges, and considered getting criminal search warrants on the al-Barakaat businesses. The headquarters of both FBI and Customs, too, started to take a special interest in the case. FBI headquarters had set up a "financial review group" to sift through the financial transactions of the 9/11 hijackers. It started to look at the al-Barakaat case, as did "Operation Green Quest," a newly formed Treasury task force with essentially the same mission as the FBI's group.

Moreover, within the upper levels of the National Security Council (NSC) and State, attention turned to al-Barakaat, and specifically to the EBI as a facilitator of terrorist finance. According to State Department cables at the time, the U.S. government had "strong evidence" that the EBI was used as a facilitator of terrorist financing. An obvious option would be to designate the bank as a supporter of terrorism and block its assets from coming into the country, a move that would send a message to the world financial community. The UAE agreed to act against al-Bar'akaat and allowed a U.S. law enforcement team to take a look at the EBI records—something none of the agents in either the intelligence or the law enforcement investigations had been able to access previously.[69]

## Designation by the Office of Foreign Asset Control

On September 23, 2001, the President signed Executive Order 13224, which expanded the list of terrorist organizations subject to freezing and blocking.

## Pre-9111 designation efforts

The mission and authorities of the Office of Foreign Asset Control (OFAC) deserve a brief discussion here. In implementing sanctions programs aimed at combating global terrorism, OFAC derives its authority from delegations under the President's powers pursuant to the International Emergency Economic Powers Act (IEEPA) and other Presidential authorities. IEEPA grants the President broad powers to deal with any unusual and extraordinary threat to the national, security, foreign policy, or    economy of the United States if the President declares a national emergency with respect to such threat,, The source of the threat must be in whole or substantial part outside the United

---

[69] As we note in chapter 3, the UAE had been a source of concern before 9/11 for their largely unregulated financial system,.

Terrorist Financing Staff Monograph

States. The President may also designate specific entities or individuals who pose or contribute to the threat and set forth the standards for identifying more such entities and individuals. The President delegates to the Executive Branch, generally the Department of Treasury or State, the task of finding those who meet that criteria and "designating" them as subject to the Executive order.

President Bill Clinton signed Executive Order 12947 in January 1995, blocking the assets in the United States of specific terrorists and terrorist groups who threatened to use force to disrupt the Middle East peace process and prohibiting U.S. persons from engaging in transactions with these groups. The groups were named as a result of a presidential judgment that they stood in the way of peace in the Middle East and, because peace in the Middle East is deemed to be vital to our own national security, posed a national security threat to the United States. The authority was not limited to those named in the executive order; those supporting or associated with those named could also be listed by an administrative designation authorized by the director of OFAC (a "secondary designation"). Usama Bin Ladin was not named on this 1995 list. However, beginning in approximately 1995 until the East Africa embassy bombings in the summer of 1998, OFAC attempted to discover a link between Usama Bin Ladin and those named on the list.. This effort was not successful, both because the links between Usama Bin Ladin and such groups were tenuous and because OFAC did not have the ability to undertake any significant classified research or analysis." In the late 1990s, there was no thought given to issuing a new executive order naming Bin Ladin, because of what one participant in the process described as "sanctions fatigue" and a general reluctance by Treasury policymakers to impose additional sanctions.

The NSC had a long and deep interest in trying to provide OFAC with sufficient resources to conduct classified all-source analysis on terrorist financing. At the direction of Richard Clarke, the Office of Management and Budget requested, and Congress appropriated, $6.4 million dollars for a center to conduct such analysis, dubbed the Foreign Terrorist Asset Tracking Center (FTATC), beginning in fiscal year 2001 (nominally October 2000). By November 2000, Clarke had suggested a two-week pilot program, which would use CIA facilities to test if the FTATC concept was workable. On the eve of 9/11, FTATC was little more than a plan on paper and an unspent budget authorization.

After the East Africa bombings, President Clinton amended EO. 12947 to name Usama Bin Ladin and his key aides, thereby prohibiting any U.S. persons from financial dealings with any of them. But the OFAC's success in blocking terrorist assets under this order was limited, for it covers only property or interests in of U.S. persons or within the United States. Moreover, because it named individuals, not groups, OFAC could not build on it with secondary designations—a listing by the head of OFAC of individuals

---

[70] This was a significant problem both before and after the September 11 attacks. OFAC line level analysts were nearly universal in their frustration in not being able to engage in the type of all source analysis that would be required to understand the financial links involved.. One analyst with a background in intelligence described the process by which OFAC obtained classified documents as 20 years behind the procedure used by the CIA..

National Commission on Terrorist Attacks Upon the United States

supporting the group named in the executive order. In addition, there was little intelligence on assets to block. These limitations were sources of frustration for the NSC, which wanted action on the financial front of the government's war on Bin Ladin. In retrospect, one OFAC official thought that the reason it was unable to freeze Bin Ladin assets is because none existed within OFAC's jurisdiction.

The United Nations Security Council passed UNSCR 1267 on October 15, 1999, calling for the Taliban to surrender Bin Ladin or face a U.S.-style international freeze of its assets and transactions. The resolution gave a 30-day period before sanctions took effect, however, allowing the Taliban and al Qaeda to repatriate funds from banks in the United Kingdom and Germany to Afghanistan. As a result, these sanctions brought official international censure but were easily circumvented.

## Post-9111 designation efforts

After the 9/11 attacks, the President signed Executive Order 13224 with great fanfare (the White House described it as the "first strike in the war on tenor"), but since OFAC already had the ability to go after Bin Ladin and Taliban assets from the prior executive orders, it did little to change OFAC's authorities to name, block, and freeze assets associated with Usama Bin Ladin or the Taliban. After the attacks, OFAC accelerated the search for entities to name by either a presidential declaration (by amending the list attached to E.O. 13224) or a secondary administrative designation, working off a CIA-supplied list of entities and persons. OFAC analysts and attorneys, like everyone in the government engaged in counterterrorism at the time, were working nights and weekends to evaluate and put together administrative records sufficient to freeze the assets of these entities. A significant number of these individuals needed access to classified information, but they had virtually no facilities in which to handle it. As a result, a number of them crammed into the secure FinCEN facility in Northern Virginia that, unlike OFAC's downtown offices, could handle the most highly sensitive materials.

OFAC analysts started working on the designation of al-Barakaat about two weeks after the attacks. This effort won preliminary approval almost immediately from Treasury officials, on the basis of a one-page memo. Thereafter, OFAC officials began a two-pronged approach to supporting the designation: gathering information informally through an OFAC analyst's contacts with U.S. law enforcement, and conducting research on classified documents at FinCEN's secure facility.. The informal method for gathering law enforcement data was necessary because of the weaknesses of the FBI's data system. The FBI, unlike the foreign intelligence agencies, wrote very few finished intelligence reports. The only way to find out what was happening domestically was either to troll the FBI's data system, ACS (Automated Case Support), for periodic reports (a hit-or-miss proposition at best) or call field agents and ask them what was going on (if you knew whom to call). The analysts' efforts to survey the foreign intelligence were easier because the reports were more centralized, but had other frustrations: because of Treasury's archaic method of retrieving intelligence, the analysts received only about half of the relevant intelligence on Jumale and al-Barakaat, and the omitted material included some

78

Terrorist Financing Staff Monograph

of the best, most useful reports (a fact that was not known to the analysts until after the designation).

Nevertheless, the OFAC analysts plowed forward and put together a package on al-Barakaat. They were greatly helped by a list of worldwide al-Barakaat offices seized,, cluring a raidpf an al-Barakaat office j.n Norway and shared with the United States.(The analysts were told that they did not need to have evidence that each al-Barakaat entity• took part in terrorist financing it was sufficient to show onl that the main enti itself) was involved to be able to close all of the branches and freeze all of the money. Thus, the) analysts needed onlytorpfeito the seized telephone lists or a commercial index of! businesses such as Dun & Bradstreet to *ustifylhe closing of each al-Barakaat branch office. The Justice Department which would have to defend any action should there be a legal challenge, blessed the sufficiency of this tactic.

More nationwide coordination took place, including meetings at the NSC, the FBI, and Customs. As people within the law enforcement community came to understand what OFAC was planning, they asked it to hold off for 60 or 90 days so they could continue their investigations. A number of field offices made this request, as did the Office of Naval Intelligence, which was in the midst of a major intelligence operation on al-Barakaat. OFAC, however, was under substantial pressure to proceed with the designation as rapidly as possible. The analysts also wanted more time to make their evidentiary package more complete and robust, but the OFAC management, apparently reacting to external demands, told them they could not have it. Moreover, the head of the FBI's terrorist-financing effort ultimately concurred in the action.

The post-9/11 period at OFAC was "chaos." The goal set at the policy levels of the White House and Treasury was to conduct a public and aggressive series of designations to show the world community and our allies that the United States was serious about pursuing the financial targets. It entailed a major designation every four weeks, accompanied by derivative designations throughout the month. As a result, Treasury officials acknowledged that some of the evidentiary foundations for the early designations were quite weak. One participant (and an advocate of the designation process generally) stated that "we were so forward leaning we almost fell on our face.." The rush to designate came primarily from the NSC and gave pause to many in the government. Some believed that the government's haste in this area, and its preference for IEEPA sanctions, might result in a high level of false designations that would ultimately jeopardize the United States' ability to persuade other countries to designate groups as terrorist organizations. Ultimately, as we discuss later, this proved to be the case with the al-Barakaat designations, mainly because they relied on a derivative designation theory, in which no direct proof of culpability was needed.

A range of key countries were notified several days in advance of the planned U.S. designation of the al-Barakaat entities, and were urged to freeze related assets pursuant to the own authorities.

National Commission on Terrorist Attacks Upon the United States

## *The November Raids*

On November 7, 2001, federal agents entered eight al-Barakaat offices in Minneapolis; Columbus, Ohio; Alexandria, Virginia; Seattle, Washington; and Boston, Massachusetts. Using Treasury Department private contractors who handle asset forfeiture, OFAC and federal agents seized everything with the businesses. In the UAE, about $1 million was seized from the UAE EBI accounts, four offices were raided and their records seized, and Jumale was ordered not to leave the UAE. The U.S. actions resulted in the freezing of approximately $1.1 million, and Treasury claimed that the actions disrupted approximately $65 million in annual remittances from the United States alone.

The President of the United States traveled to FinCEN's offices and, with the Secretary of the Treasury and Attorney General, announced the action in a press event, describing Jumale as a "friend and supporter' of Usama Bin Ladin." Secretary of the Treasury Paul O'Neill described al-Barakaat offices as "the money movers, the quartermasters of terror .. a principal source of funding, intelligence and money transfers for Bin Ladin.." He later announced that "we estimate that $25 million was skimmed from the al-Barakaat network of companies each year, and re-directed toward terrorist operations."

Abdullahi Farah was the owner of Global Services, one of the Minneapolis wire remittance companies named in the November 7, 2001 blocking order. He is a naturalized U.S. citizen, having emigrated from Somalia in 1992.. Although there already were money remitter's in Minneapolis at the time, Farah believed that there was still a need for his services in the Somali community. Farah previously had been a customer of al-Bar'akaat and had dealt with the al-Barakaat business representative for North America. After having applied for a license and after establishing a formal business relationship with al-Barakaat, Farah opened his operation.. He claims that he never met Jumale and had only an arm's-length business relationship with al-Bankaat. While the business was cyclical, with more money being transmitted during Ramadan, Farah generally transmitted about $200,000 per month. He banked at the local Norwest Bank, where he would deposit cash from his customers and then wire aggregate amounts to al-Barakaat's central office in the UAE. Farah made approximately $1,200 per month from this business, and paid another employee about the same.

Farah's first interaction with the federal government with regard to his business occurred on November 7, 2001, when armed agents entered and seized his business, confiscated all his records and his office equipment, and put a seal on the door preventing reentry. His three business accounts, containing approximately $298,000 of his customers' money, were frozen, making it impossible for him to send that money forward on their behalf The name of his company was placed on the U.S. and UN lists as a supporter of terrorism.

The money that his customers, primarily Somali immigrants, had entrusted to Farah was not delivered to the intended recipients; his customers were angry and suspicious and did not accept his explanations as to what had become of it. Most of his customers simply did not believe that the U.S. government could do such a thing. For many Somalis, the

Terrorist Financing Staff Monograph

blocked money represented their life savings and an economic lifeline to an impoverished country. The United Nations estimated that the freeze cut the remittances to Somalia in half.

Another of the Minneapolis money remitters, Garad Nor (also a U..S. citizen), had a considerably bigger problem. On November 30, 2001, both Nor and his business were publicly designated as a supporter of terrorist as a consequence of runn:mga money• remittingcompanyjhe net effect of that designation was_that no one in the United States) could engage in any financial transactions with him. Not only could he not work but, in) the words of his lawyer, "the guy couldn't buy a cup 0f coffee" without violating the OFAC   blocking order. On April 26 2002, after he filed suitmainst  the United States,._ 0FACissued a license to Nor to allow him to get sufficient money to live, As a result, fox! five months NOT                              rnenviableCliOrCeOfstarving or  being in' criminal violation of the OFAC blocking order.:

## The Effect of the al-Barakaat Seizures

Al-Barakaat offices were closed in the United States, the UAE, Djibouti, and Ethiopia. Before the action against al-Barakaat, the CIA surmised that AIAI would easily move to other financial institutions in the event that al-Barakaat was shut down. It also understood that the loss of money from al-Barakaat would only temporarily disrupt AIAI, which had other revenue sources. Early intelligence reporting after the freeze indicated that AIAI came under financial pressure because of the closure of al-Barakaat, but moved quickly to develop alternative funding mechanisms. There was no analysis of whether that pressure was the natural result of the closing of the country's largest conduit of funds or was due particularly to al-Barakaat's alleged complicity in funding AIAI. Al-Barakaat ultimately moved its offices to other locations in Dubai and Somalia and changed its name. Moreover, AIAI was able to move money through alternative means. Even as early as mid-November 2001, the CIA judged the Islamic terrorist-funding networks to be "robust," indicating that most Sunni-based Islamic terrorist funding went through interlocking Islamic NGOs and financial entities in the Gulf region. To this day, the Commission staff has uncovered no evidence that closing the al-Barakaat network hurt al Qaeda financially.

## U.S. Investigators Travel to the UAE

As OFAC continued to gather support: for designations, or designation packages, plans were made to send a team of investigative agents to the UAE to look at records seized from the al-Barakaat offices as well as the al-Barakaat bank records at the EBI. The investigators moved into the main conference room of the UAE's central bank and were supplied with thousands of pages of documents culled from ten accounts held by al-Barakaat. They were able to take back to the United States for further analysis about 7,000 pages of documents from this trip. The investigators obtained unparalleled access and support (unparalleled even in the United States, where criminal investigators do not typically work closely with the central bank regulators) However, the size and complexity of this investigation of a worldwide financial network, responsible for

National Commission on Terrorist Attacks Upon the United States

moving millions of dollars, required a follow-up trip in March 2002. In the United States, a financial investigation can take years before investigators understand the intricate financial transactions involved.

Before the second trip, the agent spearheading the effort for the FBI reviewed the OFAC designation package for al-Barakaat and noticed some discrepancies between it and the evidence obtained on the first UAE trip. His review left him with a number of significant factual questions concerning what he thought to be uncorroborated allegations of al-Barakaat's ties to al Qaeda and AIAI. For example, the designation package described Jumale as an associate of Usama Bin Ladin from the original Afghanistan jihad, who was expelled from Saudi Arabia and then moved to Sudan, and who currently lives in Kenya. However, the documentation obtained fi'om the first UAE trip, including Jumale's passport, did not support that intelligence. In addition, a number of EBI accounts that had been frozen did not appear, from the records obtained and analyzed, to be associated with al-Barakaat at all. Overall, the agent believed that much of the evidence for al-Barakaat's terrorist ties rested on unsubstantiated and uncorroborated statements of domestic FBI sources.

The second U.S. delegation to the UAE enjoyed a level of cooperation similar to that of the first. The UAE Central Bank placed 1.5 people at the investigative team's beck and call. The UAE government did everything the U S. team requested, including working all night at times to make copies of documents. Jumale was interviewed by U.S. federal agents twice, the first time for ten hours. The U.S. investigative team interviewed 23 individuals (including Jumale), other top al-Barakaat personnel, its outside accountant, and various UAE banking officials. They also reviewed approximately 2 million pages of records, including the actual EBI bank records.

To review some records, the U.S. government team worked where the records were maintained: in un-air-conditioned warehouses in the desert, in stifling 13.5-degree heat.. The agents found that the bank maintained the same kind of records as one would find in the United States and that they were relatively complete, well-organized, and well-preserved. In fact, it appeared to the agent that the records extended far into the past; UAE banks apparently did not systematically destroy older records, as U.S. financial institutions commonly do. Constraints of time and resources prevented the agents from conducting a comprehensive audit of all the records. Instead, they focused on key persons and entities, looked for suspicious transactions, and selected certain dates as representative samples for detailed analysis. On this second trip, the U S. team brought copies of about 10,000 pages back to the United States for further analysis. Additionally, the FBI was able to make mirror images of data from dozens of the al-Barakaat and EBI computers for further analysis.

## *No Direct Evidence That al-Barakaat Funded Terrorism*

The FBI agent who led the second U.S. delegation said diligent investigation in the UAE revealed no "smoking gun" evidence—either testimonial or documentary—showing that al-Bar'akaat was funding AIAI or al Qaeda.. In fact, the U S. team could find no direct

Terrorist Financing Staff Monograph

evidence at all of any real link between al-Barakaat and terrorism of any type. The two major claims, that Bin Ladin was an early investor in al-Barakaat and that al-Barakaat diverted a certain portion of the money through its system to AIAI or al Qaeda, could not be verified. Jumale and all the al-Barakaat witnesses denied any ties to al Qaeda or AIM, and none of the financial evidence the investigators examined directly contradicted these claims. Moreover, some of the claims made by the early intelligence, such as the assertion that Jumale and Bin Ladin were in Afghanistan together, proved to be wrong. In additional, it appeared that the volume of money was significantly overstated. Secretary O'Neill, in his announcement of the al-Barakaat action, had estimated that al-Barakaat had skimmed $25 million per year and redirected it toward terrorist operations. The agents found that the profits for all of al-Barakaat (from which this money would have to come) totaled only about $700,000 per year, and could not conclude whether *any* of that money had been skimmed.

Although the U.S. team could not find evidence of terrorist financing, they did identify several inexplicable anomalies in the evidence. For example, the team's review of documents revealed several suspicious transactions that Jumale could not: adequately explain. Specifically, two NGOs made a number of unusually large deposits into the account of a Kuwaiti charity official over which Jumale had power of attorney. The funds were then moved out of the account in cash. When asked to explain the transactions, Jumale claimed that the money was deposited for use in Somalia. After the deposit, the charity would direct Jumale to send cash from those accounts to Somalia for charitable or religious purposes, such as building a mosque. Because the funds were sent as cash, no other records existed.

The FBI thought this explanation suspicious, as it was inconsistent with Jumale's normal business practices. Although the cash nature of the transactions may have been necessitated by the state of the financial system in Somalia—given the absence of financial institutions there, sending cash may have been the best way to build a mosque-al-Barakaat had a bank in Somalia to which the funds for charitable use could have been sent. However, the agents could draw only suspicions and no conclusions from these transactions. The money transfers might have involved terrorism, they might have represented the proceeds of another kind of crime, or they might have been nothing at all. There was just no way to tell.

At the conclusion of the trip, the agent spearheading the FBI portion of the trip drafted a memorandum, to be distributed to the UAE officials, describing the conclusion the team had reached:

> It has been alleged that the Barakaat Group of Companies were assisting, sponsoring, or providing financial, material, or other services in support of known terrorist organizations. Media and U S. law enforcement reports have linked al-Barakaat companies and its principle manager, Ahmed Nut Ali Jumale, to Usama bin Ladin and bin Ladin's efforts to fund terrorist activities. *However, this information is generally not firsthand information or it has not been*

National Commission on Terrorist Attacks Upon the United States

> *corroborated by documentary or other circumstantial evidence that*
> *supports the allegation.* For example, it has been reported that it is
> common knowledge in the United States–based Somali community
> that Al Barakaat is a money laundering operation backed by bin
> Ladin. It has also been reported that bin Ladin provided Mr. Jumale
> the initial financing to start the Al Barakaat businesses. *At this time,*
> *these items of information have not been substantiated through*
> *investigative means.* (emphasis added)

Thus, notwithstanding the unprecedented cooperation by the UAE, significant FBI
interviews of the principal players involved in al-Barakaat (including its founder), and
complete and unfettered access to al-Barakaat's financial records, the FBI could not
substantiate any links between al-Barakaat and terrorism.

OFAC-analysts hotly contest this conclusion, and insist that their designation, was based
on solid intelligence. The FBI's conclusions, they argue, reflect a profound
misunderstanding of the case, and ignore certain pieces of intelligence [71] At the very
least, the OFAC officials contend, there is credible evidence that al-Barakaat was a
money-laundering group, responsible for millions in U.S. currency being laundered
through the United States, to an account in the UAE, and then out to suspect third-party
countries. Additionally, they point to documents yet to be translated, as well as records
from the hard drives of al-Barakaat, in the FBI's possession and yet to be analyzed. At
this writing, neither the FBI nor OFAC is attempting to continue to investigate this case.

## Delisting Designated Entities and Concluding the Case

Other countries who had joined in the international designation of al-Barakaat were
voicing real concern by early 2002. Their concern stemmed in part from a difference j.ll
119W ᵍᵃᵠʰ 99,¹¹¹¹.4Y.,§Pᵗits terror, financing designation §P¹|9.¹|¹9-4¹| ᵗhP UlliᵗᵉLS.taᵗᵉᵠ,, f9.l
example the power to designate derives from the executive's power to wage war against
:foreign enemies. As a resuir. the executive may rely on less evidence than is required inai
¹criminal or even civil trial. The judicial review that is afforded a designation is extremely
deferential to the executive's judgment, In other countries, a designation isyiewed as a
judicial or quasi-judicial act, in which the accused is afforded a right to answer the)
charges and the standard of evidence is at least as high as would be needed to sustain a
civil lawsuit.:

In January 2002, three Swedish citizens of Somali origin who were listed in the original
al-Barakaat designation petitioned OFAC and the United Nations for removal from the
list. Sweden, although not a member of the UN Security Council, sought to have the
Council adopt a criminal evidentiary standard prior to placing anyone on the sanctions
list. The Canadians, similarly, moved to take one of its own citizens off the UN list. All

---

[71] Intelligence community sources have informed Commission staff that the intelligence sources fox much
of the reporting regarding al-Barakaat's connection to al Qaeda have since been terminated by the relevant
agency as intelligence sources, based on concerns of fabrication

Ten orist Financing Staff Monograph

of the UN designations to that point had come at the suggestion of the United States, and the Swedish proposal could have required the removal of either most or all of the names on the list. The State Department sent demarches to all Security Council member nations, urging "in the strongest terms" that they oppose Swedish effort

Meanwhile, in Minneapolis, Abdullahi Farah and Garad Nor were trying to resolve their cases and working toward getting their money unfrozen They hired a lawyer, who made both men available for interviews with the U.S. Attorney's Office and federal agents concerning their involvement in al-Barakaat. [72] The lawyer contacted OFAC to try to resolve the case; for months the calls were unreturned and neither of his clients was told of the evidentiary basis of the freezing actions. Finally, in April 2002, Farah and Nor filed suit against the government, alleging that the OFAC action deprived them of their constitutional rights.

In response to the lawsuits and the concerns of our allies, and in order to forestall more ac:ligI,l, United States, who claimed that they were designated incorrectly. At the time, there was no procedure to delist, either at the United Nations or at OFAC. Ultimately, the Policy Coordinating Committee decided on a set of standards to use. Treasury Under Secretary Jimmy Gurule went to the UN in the spring of 2002 and presented a whitepaper on delisting, which: included a requirement for an attestation that the individual had. severed the link with the: tainted organization and a commitment not to associate with terrorist-related entities again, The goal was to force behavior, changes and to have an orderly process based on principles, as opposed to requests for delistings based on the "inconvenience" or dislike of the designations regime,.

The OFAC analysts were then required to go back and justify their designations of the three Swedes and the 11,S, al:13arakaat entities and *mdividualsjor the original listing, the analysts were required to show only that the individual entitieswerepart Of the overall al₇parakaat operation, whiChilieypoulkdo through cornmercialdirectoriessuc as the Pun &Bradstreet registry, as wellAsIlle list that had Joeen_seized in Norway. In the spiIna and summer of 2002,_however, the analysts were tasked to show that each al 13arakaat individual was involved in the fundmg_of terrorism, rather than that he or she simply belonged to an entity that, overall, supported terrorism. There was nosuch' evidence, attliPu⁸h QVAC analysts complained of not havina sufficient access to classified information, as well as bein⁸ denied information held by the FBI.:73'

---

[72] Farah was interviewed, but the US. Attorney's Office never arranged to interview Nor,.

[73] The analysts were hampered in-the fact that they did not have access to the records seized in the November raids.. While those records were seized under OFAC authority, it was limited only to seizing and retaining them. In order to exploit them for evidentiary purposes, the FBI was able to execute a search warrant, which was then served on OFAC as custodian of the records. Those records were imaged and made available to the criminal agents and the U.S. Attorney's Office.. According to the OFAC analysts, the FBI, perhaps burned by what they considered a premature designation, never shared a copy of the seized records with them.,

85

National Commission on Terrorist Attacks Upon the United States

On August 27, 2002, OFAC removed the U.S.-based money remitters in Minneapolis and, Columbus, Ohio, as well as two of the three Somali Swedes, from its list of designated) entities. Abdullahi Farah, the Minneapolis money remitter, signed an affidavit stating .that: he had severed all ties with al-Barakaat, and received his money back. Throug,houtthe: , litigation, Nor had maintained that he was unassociated with al-Barakaat, and signed an' affidavit to that effect. He, too, received his money hack.;

The federal agents working on the al-Barakaat criminal investigation in Minneapolis spent hundreds of hours reyiewing financial $_1$ecords and interviewing witnesses. Despite this effort,: their attempt to make a criminal case simply had no traction. Ultimately, prosecutors were unable to file charges against any of the al-Barakaat participants, with the exception of one of the customers in Minneapolis who was charged with low-level welfare fraud. The FBI supervisor on the criminal case, deciding that their efforts could be better spent elsewhere, closed their investigation.

---

[74] The third was found to have made false statements to the investigating agents and on his application for removal from the list

**OFAC LIST OF THE MISSING MONEY OF THE MIRAF'S CUSTOMERS.**

| NAME OF THE SENDER | CITY OF SENDER | DESTINATION | TELEPHONE | CUSTOMER MONEY |
|---|---|---|---|---|
| ABADIR AHMED ABDI | DECATUR,GA | ADIS ABABA | 404-508-4504 | $53.00 |
| ABBAS MOHAMED ALI | CLARKSTON,GA | NAIROBI, KENYA | 404-299-7824 | $53.00 |
| ABDI SHEE (MOHAMED SH. JEYLA | CLARKSTON,GA | MOGADISHU | 404-299-7974 | $315.00 |
| ABDIRAHIM H. OMAR ALI | CLARKSTON,GA | ZURICH, SWISS | 404-508-1286 | $1,030.00 |
| ABDIRASHID ALI MOHAMED | CLARKSTON,GA | NAIROBI, KENYA | 404292-0776 | $53.00 |
| ABDIRASHID M. MOALLIM | CLARKSTON,GA | MOGADISHU | 404-299-5308 | $105.00 |
| ABDIRASHID M. MOALLIM | CLARKSTON,GA | MOGADISHU | 404-299-5308 | $105.00 |
| ABDIRISAQ ADAN MOHAMED | ATLANTA, GA | NAIROBI, KENYA | 404-668-5927 | $212.00 |
| ABDIRISAQ MUSE OSMAN | STONE MTN, GA | MOGADISHU | 404-292-0776 | $210.00 |
| ABDIWELI OMAR MOHAMUD | CLARKSTON,GA | JEDDAH, KSA | 404-296-6958 | $105.00 |
| ABDULLAHI AHMED DERESU | ATLANTA, GA | CAIRO,EGYPT | 404315-1537 | $212.00 |
| ABDULLAHI AHMED DERESU | CLARKSTON,GA | ADIS ABABA | 404-298-6641 | $424.00 |
| ABDULLAHI HABBAD GEEDDI | LAWRENCEVILLE, GA | MOGADISHU | 770-717-7111 | $105.00 |
| ABUKAR MOHAMED ALI | CLARKSTON,GA | NAIROBI, KENYA | 404-292-1688 | $106.00 |
| ADAN ALLIYYI OSMAN | MARIETTA, GA | MINNEAPOLIS. MN | 770-982-6495 | $167.00 |
| ADAN ISAQ RAGE | NORCROSS, GA | MADHERA, KENYA | 770-409-1981 | $106.00 |
| ADAN JEYTE WEHELIYE | DECATUR,GA | SEATTLE, WA | 404-822-3939 | $256.00 |
| AHMADIN ADAM NUR | CLARKSTON,GA | NAIROBI, KENYA | 404-844-4055 | $25.00 |
| AHMED ABDULKADIR AHMED | CLARKSTON,GA | NAIROBI, KENYA | 404-292-7016 | $53.00 |
| AHMED ABDULKADIR YONIS | CLARKSTON,GA | CAIRO,EGYPT | 404-297-4804 | $250.00 |
| AHMED ALI AHMED | STONE MTN, GA | MOGADISHU | 404-508-0567 | $52.50 |
| AHMED MOHAMED OMAR | CLARKSTON,GA | MOGADISHU | 404-292-4022 | $52.50 |
| AHMED-FOWZI MOHAME OSMAN | SOUTHFIELD, MI | MOGADISHU | 248-395-3758 | $110.00 |
| AKECH KUOL JOK | CLARKSTON,GA | NAIROBI, KENYA | 404-299-8853 | $53.00 |
| ALEMNESH G/TENSAYE KASSA | CLARKSTON,GA | ADIS ABABA | 404-296-5178 | $265.00 |
| ALI MOALLIM ISAQ(HASSAN SH. M | STONE MTN, GA | CAIRO,EGYPT | 404-294-1073 | $53.00 |
| ALIYAH H. MUNYE (MARYAM AHM | CLARKSTON,GA | NAIROBI, KENYA | 404-298-1008 | $106.00 |
| AMINA ABDULLAHI MOHAMED | CLARKSTON,GA | GARISA, KENYA | 404-297-5790 | $212.00 |
| AMINA OSMAN SHEYLILA | DECATUR,GA | MOGADISHU | 404-294-9064 | $52.50 |
| AMINA OSMAN SHEYLILA | DECATUR,GA | MOGADISHU | 404-294-9064 | $26.25 |
| AMINA OSMAN SHEYLILA | DECATUR,GA | MOGADISHU | 404-294-9064 | $26.25 |
| AMINA OSMAN SHEYLILA | DECATUR,GA | MOGADISHU | 404-294-9064 | $26.25 |

EXHIBIT.

**N**

| | | | | |
|---|---|---|---|---|
| AMINA OSMAN.SHEYLILA | DECATUR,GA | MOGADISHU | 404-294-9064 | $26.25 |
| AMINA OSMAN SHEYLILA | DECATUR,GA | MOGADISHU | 404-294-9064 | $26.25 |
| AMIR. HASSAN ALSIBER | ATLANTA. GA | CAIRO,EGYPT | 678-380-9033 | $106.00 |
| ANISA ABDOSH | JOHNSON CITY, TN | CAIRO,EGYPT | 423-928-6641 | $159.00 |
| ANISA XUSEN SHARIF(SAHRA) | CLARKSTON,GA | MADHERA, KENYA | 404-296-9569 | $159.00 |
| ASHETE KEBEDE WORKU | CLARKSTON ,GA | ADIS ABABA | 404-298-9042 | $212.00 |
| ASRAT SIYUM HABTE | ATLANTA, GA | CAIRO,EGYPT | 678-924-3788 | $106.00 |
| ASTUR MOHAMED AHMED | CLARKSTON ,GA | NAIROBI, KENYA | 404-508-8953 | $53.00 |
| AYNALEM KEBEDE | MARIETTA. GA | ADIS ABABA | 404-486-0887 | $212.00 |
| BAKRI BORAMA | ATLANTA. GA | ADIS ABABA | 404-633-5442 | $212.00 |
| BEKELE ZEGEYE | CLARKSTON,GA | NAIROBI, KENYA | 404-508-6498 | $106.00 |
| BELEW GUGSSA SEYOUM | ATLANTA, GA | ADIS ABABA | 404-417-9468 | $106.00 |
| BERHANE B. EKUBAY | CLARKSTON,GA | ADIS ABABA | 404-296-5387 | $212.00 |
| BERHANU AJIGU | CLARKSTON,GA | NAIROBI, KENYA | 404-580-3955 | $265.00 |
| BERHANU AJIGU | CLARKSTON ,GA | ADIS ABABA | 404-580-3955 | $265.00 |
| BILAN M. HASSAN (HIBO) | STONE MTN, GA | ADIS ABABA | 404-296-6175 | $159.00 |
| BOUM LAM | CLARKSTON,GA | ADIS ABABA | 404-294-0588 | $106.00 |
| CHAGAI JAMES | CLARKSTON.GA | NAIROBI, KENYA | 404-499-0291 | $53 |
| DANIEL MABIL BER | DECATUR,GA | NAIROBI, KENYA | 404-292-7825 | $53.00 |
| DAWIT ADUNYA | ATLANTA, GA | NAIROBI, KENYA | 404-633-3564 | $212.00 |
| DAWIT TESHOME | CLARKSTON,GA | ADIS ABABA | 404-296-8868 | $53.00 |
| ELEMTSEHAY HAILE | LAWRENCEVILLE, GA | ADIS ABABA | 770-593-3497 | $106.00 |
| ESHETE ZEMENE W/HEWOT | CLARKSTON,GA | ADIS ABABA | 404-298-5514 | $318.00 |
| ETSQENET BERHANU | **SMYRNA,GA** | ADIS ABABA | 770-444-9655 | $318.00 |
| ETSQENET BERHANU | SMYRNA,GA | ADIS ABABA | 770-444-9655 | $212.00 |
| FARHIYA YUSUF AHMED | DECATUR,GA | NAIROBI, KENYA | 404-294-8581 | $212.00 |
| FATUMA ABDI ELMI | DECATUR,GA | GARISA, KENYA | 404-299-6695 | $21.00 |
| FATUMA AHMED DAKHARE | CLARKSTON,GA | NAIROBI, KENYA | 404-294-7001 | $53.00 |
| FATUMA AHMED MOHAMED | ATLANTA, GA | NAIROBI, KENYA | 678-319-0141 | $300.00 |
| FATUMA DAHIR HADDAAD | CLARKSTON,GA | JEDDAH, KSA | 404-499-8805 | $210.00 |
| FATUMA DAHIR HADDAAD | CLARKSTON,GA | TE'IZ, YEMEN | 404-499-8805 | $212.00 |
| FATUMA DAHIR HADDAAD | CLARKSTON,GA | SANA, YEMEN | 404-499-8805 | $106.00 |
| FATUMA DAHIR HADDAAD | CLARKSTON,GA | SANA, YEMEN | 404-499-8805 | $159.00 |
| FATUMA DAHIR HADDAAD | CLARKSTON,GA | SANA, YEMEN | 404-499-8805 | $53.00 |
| FATUMA MOHAMED JAMA | DECATUR,GA | MINNEAPOLIS, MN | 404-687-0637 | $208.00 |
| FATUMA SAYID AHMED | CLARKSTON.GA | NAIROBI, KENYA | 404-299-81.71 | $106.00 |
| FATUMA SURO | CLARKSTON,GA | NAIROBI, KENYA | 404-298-4274 | $53.00 |

| | | | | |
|---|---|---|---|---|
| FAYSAL AHMED NUR | STONE MTN, GA | NAIROBI, KENYA | 404-508-3894 | $106.00 |
| FAYSAL AHMED NUR | STONE MTN, GA | NAIROBI, KENYA | 404-508-3894 | $212.00 |
| GABRIEL KAN KAI | CLARKSTON,GA | NAIROBI, KENYA | 404-299-1565 | $53.00 |
| HABIB MOHAMED SAID | ATLANTA, GA | ADIS ABABA | 404-808-7680 | $128.00 |
| HABIBA MOHAMED MUKHTAR | CLARKSTON,GA | MOGADISHU | 404-296-4806 | $52.50 |
| HAILU KEFENI AROBELE | TUCKER. GA | NAIROBI, KENYA | 770-723-9114 | $212.00 |
| HALIMA AWABDI MOHAMUD | CLARKSTON,GA | NAIROBI, KENYA | 404-294-4984 | $106.00 |
| HALIMO BILE WABERI | MARIETTA, GA | DJIBOUTI, DJIBOUTI | 770-695-4353 | $318.00 |
| HALIMO SH. OSMAN(FATUMA KO) | CLARKSTON,GA | NAIROBI, KENYA | 404-297-6404 | $159.00 |
| HASSAN ISAQ LIBAN | NORCROSS, GA | NAIROBI, KENYA | 770-448-2144 | $212.00 |
| HAWO HERS1 ARAB | DECATUR,GA | MOGADISHU | 404-508-4074 | $52.50 |
| HAWO HERSI ARAB | DECATUR,GA | NAIROBI, KENYA | 404-508-4074 | $106.00 |
| HAWO HUSSEIN OSMAN | STONE MTN. GA | MOGADISHU | 404-298-5543 | $105.00 |
| HIBO ALI ABDULLAHI (SUAD SAKA | MARIETTA, GA | ADIS ABABA | 770-513-8414 | $106.00 |
| HIBO MOHAMED OMAR | STONE MTN, GA | NAIROBI, KENYA | 404-501-9071 | $212.00 |
| HIWOT GEBREYESUS | CLARKSTON,GA | NAIROBI, KENYA | 404-299-7728 | $424.00 |
| HIWOT WOREDE | CLARKSTON,GA | NAIROBI, KENYA | 404-296-6722 | $53.00 |
| HIWOT WOREDE | CLARKSTON,GA | NAIROBI, KENYA | 404-296-6722 | $318.00 |
| HIWOT WOREDE | CLARKSTON,GA | GONDER,ETH1OPIA | 404-296-6722 | $212.00 |
| HULU BERHE | DECATUR,GA | ADIS ABABA | 404-292-7175 | $212.00 |
| IBRAHIM AHMED ABDALLA | LILBURN, GA | ADIS ABABA | 770-513-4693 | $106.00 |
| IBRAHIM OMAR ABDIKARIM | CLARKSTON,GA | MOGADISHU | 404-297-7682 | $105.00 |
| JAFAR YUSUF AHMED | STONE MTN, GA | DIRE DAWA, ETHIO | 770-323-4716 | $1,050.00 |
| JAMA ARTAN SHURIE | CLARKSTON,GA | TORONTO, CA | 404-299-2070 | $208.00 |
| JAMAL AHMED ABDISHAKUR | CLARKSTON,GA | NAIROBI, KENYA | 404-499-1172 | $53.00 |
| KAMAL ABUBAKAR | ATLANTA, GA | NAIROBI, KENYA | 404-344-8488 | $106.00 |
| KHALID MUSE OMAR | CLARKSTON,GA | ADIS ABABA | 404-508-2200 | $106.00 |
| KHEYRIA AHMED ISSE | CLARKSTON,GA | NAIROBI, KENYA | 404-499-0177 | $26.00 |
| KIIMIYA ADAM ALIYYI | SNELLVILLE, GA | NAIROBI, KENYA | 770-982-6495 | $251.00 |
| KIIMIYA ADAM ALIYYI | SNELLVILLE, GA | NAIROBI, KENYA | 770-982-6495 | $265.00 |
| KORA HASSAN MOHAMED | NORCROSS, GA | MADHERA, KENYA | 770-409-1981 | $159.00 |
| LEYLA ABDI ALI (LEYLA FARAH M | CLARKSTON ,GA | NAIROBI, KENYA | 404-296-1734 | $212.00 |
| MERON NIGUSSE T/MARIAM | CLARKSTON,GA | ADIS ABABA | 404-292-4184 | $53.00 |
| MOHAMED ABDI AHMED | NORCROSS, GA | ADIS ABABA | 770-279-7517 | $742.00 |
| MOHAMED AHMED | ATLANTA, GA | NAIROBI, KENYA | 404-808-5068 | $106.00 |
| MOHAMED BARKHAD DA'AMA | ATLANTA, GA | DJIBOUTI, DJIBOUTI | 404-3290848 | $1,050.00 |
| MOHAMED BUKURO SOMO | DECATUR,GA | NAIROBI, KENYA | 404-377-6317 | $424.00 |

| | | | | |
|---|---|---|---|---|
| MOHAMED HASSAN MUUDEEY | STONE MTN, GA | MOGADISHU | 770413-9625 | $315.00 |
| MOHAMED SHEIKH ISMAIL | CLARKSTON.GA | NAIROBI, KENYA | 404-294-4632 | $53.00 |
| MOHAMED SHEIKH MOHAMUD | NORCROSS, GA | NAIROBI, KENYA | 770-222-0744 | $159.00 |
| MUKHTAR IBRAHIM ABDALLA | LAWRENCEVILLE, GA | NAIROBI, KENYA | 404-840-5749 | $530.00 |
| MULATWA ABEBE | LAWRENCEVILLE, GA | ADIS ABABA | 770-925-2851 | $106.00 |
| MULU GEBREGABEHER | STONE MTN, GA | ADIS ABABA | 404-288-0863 | $1,050.00 |
| MULU GEBREGABEHER | STONE MTN, GA | ADIS ABABA | 404-288-0863 | $159.00 |
| MULUGETA MEKONNEN | CLARKSTON,GA | ADIS ABABA | 404-297-7930 | $212.00 |
| MURSAL MOALLIM ABDULLAHI | NORCROSS, GA | MOGADISHU | 770-840-8424 | $52.50 |
| MUSA ABDULLAHI AHMED | LILBURN, GA | NAIROBI, KENYA | 770-860-9833 | $212.00 |
| NADIYA ABAGARO | MARIETTA, GA | ADIS ABABA | 770-454-8003 | $106.00 |
| NAIMA IBRAHIM/MOHAMED IBRAH | CLARKSTON.GA | NAIROBI, KENYA | 404-299-7948 | $318.00 |
| NAIMA SAID | ATLANTA, GA | NAIROBI, KENYA | 404-325-0559 | $106.00 |
| NATDIFO OMAR JAMA | CLARKSTON,GA | NAIROBI. KENYA | 404-508-8997 | $265.00 |
| NATNAEL ZEYIDE | MARIETTA, GA | ADIS ABABA | 770-650-9625 | $212.00 |
| NEGLA HASSAN ALI | CLARKSTON,GA | RIYAD, S. ARABIA | 404-2967389 | $210.00 |
| NETSENET TESFAMICHEAL | SMYRNA,GA | JOHANSBERG, SA | 404-664-8465 | $1,050.00 |
| OSMAN HANDULE GULED | DECATUR,GA | NAIROBI, KENYA | 404-298-3261 | $53.00 |
| OSMAN SHARIF OSMAN | LILBURN. GA | AFGOYE, SOMALIA | 770-723-0799 | $105.00 |
| RAHMA DINT MOHAMED(NAFISA | NORCROSS, GA | NAIROBI, KENYA | 770-465-2626 | $106.00 |
| RISALA BADAWI ELYOBA | CLARKSTON,GA | CAIRO,EGYPT | 404-299-1919 | $106.00 |
| RIYAD H. MUSE MIRE | ATLANTA, GA | MONTREAL, CA | 404-321-6579 | $146.00 |
| ROZE KADIDA | ATLANTA, GA | NAIROBI, KENYA | 404-728-0911 | $106.00 |
| ROZE KADIDA | ATLANTA. GA | ADIS ABABA | 404-728-0911 | $318.00 |
| SA'AADA ADDAWE | CLARKSTON,GA | OTTOWA, CA | 404-294-5719 | $208.00 |
| SAFIYA ALI (RUQIYA ALI J.) | DECATUR,GA | NAIROBI, KENYA | 404-297-7607 | $106.00 |
| SAID MOHAMED SHARIF | CLARKSTON,GA | NAIROBI. KENYA | 404-297-4160 | $53.00 |
| SAMI IBRAHIM ABDULLAHI | NORCROSS, GA | ADIS ABABA | 770-736-5384 | $212.00 |
| SAMIRA MOHAMED AHMED | CLARKSTON,GA | CAIRO,EGYPT | 404-298-7921 | $106.00 |
| SHAMSIYA MOHAMED ALI | STONE MTN, GA | ADIS ABABA | 404-288-0863 | $106.00 |
| SHARIF ABUKAR SHARIF | CLARKSTON,GA | NAIROBI, KENYA | 404-297-1667 | $53.00 |
| SHARIF ZURGA | BOOTHNYIN, PA | ADIS ABABA | 302-791-1537 | $106.00 |
| SHUKRI HUSSEIN ALI | CLARKSTON,GA | NAIROBI, KENYA | 404-298-4274 | $53.00 |
| SHUKRI HUSSEIN ALI | CLARKSTON,GA | NAIROBI, KENYA | 404-298-4274 | $53.00 |
| SOLOMON G/MARIAM AYANA | MARIETTA, GA | NAIROBI, KENYA | 770-354-4263 | $106.00 |
| SOLOMON G/MARIAM AYANA | MARIETTA, GA | ADIS ABABA | 770-935-4263 | $1,050.00 |
| SOLOMON G/MARIAM AYANA | MARIETTA, GA | ADIS ABABA | 770-935-4263 | $1,050.00 |

| | | | | |
|---|---|---|---|---|
| SUBAN AWL ELMI | CLARKSTON,GA | MOGADISHU | 404-299-9437 | $105.00 |
| TAMRAT SEIFEYARED ELAMA | NORCROSS, GA | ADIS ABABA | 770-449-4633 | $1,050.00 |
| TEDDY ELAMAYU AREDA | ATLANTA, GA | ADIS ABABA | 404-929-9773 | $202.00 |
| TEDDY ELAMAYU AREDA | ATLANTA, GA | ADIS ABABA | 404-929-9773 | $96.00 |
| TSION G. GEBREMICHEAL | ATLANTA, GA | NAIROBI, KENYA | 770-234-9362 | $530.00 |
| UREJI OSMAN ADAN | CLARKSTON,GA | MOGADISHU | 404-296-5543 | $52.50 |
| UREJI OSMAN ADAN | CLARKSTON,GA | MOGADISHU | 404-296-5543 | $52.50 |
| WAHIB ALI ABDULLAHI | ATLANTA, GA | ADIS ABABA | 404-929-9293 | $159.00 |
| WERIS ABDI MOHAMED | CLARKSTON,GA | NAIROBI, KENYA | 404-298-4276 | $212.00 |
| WOSSEN ARAGA | DECATUR,GA | NAIROBI, KENYA | 404-508-0768 | $1,040.00 |
| WOSSEN ARAGA | DECATUR,GA | NAIROBI, KENYA | 404-508-0768 | $1,040.00 |
| WOSSEN ARAGA | DECATUR,GA | NAIROBI, KENYA | 404-508-0768 | $1,040.00 |
| WOSSEN ARAGA | DECATUR,GA | NAIROBI, KENYA | 404-508-0768 | $1,040.00 |
| WOSSEN ARAGA | DECATUR,GA | NAIROBI, KENYA | 404-508-0768 | $1,040.00 |
| ZEBIBA ABDO JUBER | ATLANTA, GA | ADIS ABABA | 404-634-2211 | $212.00 |
| ZEKERIAS SHIBRU | CLARKSTON,GA | ADIS ABABA | 404-508-9440 | $53.00 |

$36,111.25